# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612,

CENTER FOR BIOLOGICAL DIVERSITY
378 N Main Avenue
Tucson, AZ 85701,

FRIENDS OF THE EARTH
1101 15th Street, NW
11th Floor
Washington, DC 20005,

     and

TURTLE ISLAND RESTORATION
NETWORK
9255 Sir Francis Drake Boulevard,
Olema, CA 94950,

                 *Plaintiffs,*

    v.

NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Montgomery County, MD 20910,

     and

EUGENIO PIÑEIRO SOLER, in his official
capacity as ASSISTANT ADMINISTRATOR
for NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
1315 East-West Highway
Silver Spring, Montgomery County, MD 20910,

                 *Defendants.*

No.    8:25-cv-1627

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    This case challenges the National Marine Fisheries Service's (NMFS) issuance of

an arbitrary and capricious programmatic biological opinion governing federally authorized oil

and gas activities in the Gulf, projected over 45 years, in violation of the Endangered Species Act

(ESA) and Administrative Procedure Act (APA).

2.      More than two dozen species listed as either threatened or endangered under the ESA inhabit the Gulf. They include the critically imperiled Rice's whale—with less than 50 individuals remaining—and the Kemp's ridley sea turtle—the most endangered sea turtle in the world.

3.      The Gulf is also the epicenter of the nation's offshore oil and gas industry, with tens of thousands of active wells, thousands of production platforms, tens of thousands of miles of underwater pipelines, and hundreds of thousands of vessel trips taking place annually.

4.      The oil and gas operations harm threatened and endangered species, as well as the broader Gulf ecosystem, in a variety of ways on a daily basis. The harms sometimes become catastrophic, as when the Deepwater Horizon oil drilling rig exploded in 2010. The disaster killed 11 crew members and caused 4.9 million barrels (more than 200 million gallons) of oil to spew underwater for 87 days, spreading throughout the Gulf and coating wildlife and ecosystems. The spill killed countless marine mammals, sea turtles, fish, birds, and other wildlife. Scientists continue to discover new, long-term harms from the spill to this day.

5.      The ESA requires each federal agency, in consultation with the relevant federal wildlife service, to ensure that its actions are not likely to jeopardize the continued existence of any threatened or endangered species or destroy or adversely modify the critical habitat of any such species. This consultation process is a central feature of the ESA's framework for protecting endangered and threatened species.

6.      The Department of the Interior (Interior) implements an oil and gas leasing and development program in federal waters of the Gulf pursuant to the Outer Continental Shelf Lands Act (OCSLA). Because the program has numerous effects on threatened and endangered

species, Interior has engaged in ESA consultation with NMFS at various points in recent decades—completing the most recent previous biological opinion in 2020 (the 2020 BiOp).

7.     Plaintiffs challenged the 2020 BiOp in this Court on a number of grounds. On August 19, 2024, the Court ruled that the 2020 BiOp violated the law in several respects. The Court remanded for NMFS to complete a new biological opinion that addressed both the shortcomings the Court had identified, as well as any other issues that might be raised on remand. The Court ordered that the 2020 BiOp would be vacated on December 20, 2024, but later amended the order to defer vacatur to May 21, 2025.

8.     NMFS has now issued a new programmatic biological opinion (the 2025 BiOp)— the subject of this suit. The 2025 BiOp, however, repeats many of the same legal errors as the 2020 BiOp.

9.     The Incidental Take Statement (ITS) fails to meet what the ESA requires, by omitting anticipated incidental take of marine mammals and incidental take from oil spills. And NMFS once again arbitrarily assumed—as it did in 2007 and 2020—that an extremely large oil spill will not result from Interior's oil and gas program. In addition, the Reasonable and Prudent Alternative (RPA) to avoid jeopardy to the Rice's whale fails to comply with the ESA. The 2025 BiOp is riddled with other inadequate analyses and flaws that violate the ESA. For example, NMFS ignored the increasing effects of climate change when assessing jeopardy.

10.     Plaintiffs therefore ask this Court to declare that the 2025 BiOp is arbitrary and capricious and contrary to law, in violation of the APA and ESA, and to vacate and remand the 2025 BiOp to NMFS with an order to prepare a sufficiently protective biological opinion within six months.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 (federal question) and 5 U.S.C. § 704 (APA).

12.     Venue properly vests in this District pursuant to 28 U.S.C. § 1391(b) and (e)(i) because NMFS's headquarters are located in this District and a substantial part of the events and omissions which gave rise to this action occurred in this District.

13.     This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

14.      Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country, with more than 600,000 members nationally in 67 chapters in all 50 states, the District of Columbia, and Puerto Rico; including nearly 14,000 members in Sierra Club's Maryland Chapter. Sierra Club members use the public lands and waters throughout the Gulf, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by oil and gas activities, including threatened and endangered species such as sperm whales and green sea turtles. For example, one member who has visited or lived on and near the Gulf of Mexico for more than 60 years, regularly spends time boating and fishing offshore in the Gulf's deep waters for a variety of species, such as red snapper, redfish, black

drum, cobia and triggerfish. During these trips, he looks for Rice's whales and enjoys seeing sea turtles, dolphins, and other marine species. He also enjoys camping with his family on the Gulf's barrier islands. And he has actively advocated for Gulf sturgeon protections. Sierra Club brings this action on behalf of its members.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit corporation that maintains offices across the United States and in Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Atlantic, Gulf, California, and Alaska coasts from the harmful impacts of offshore oil and gas drilling. The Center has more than 93,000 members, including members who live and recreate throughout the Gulf and Atlantic coast. For example, one Center member lives in Texas and regularly uses the Gulf of Mexico to go swimming, kite surfing, and to observe and look for wildlife including Kemp's ridley sea turtles, green sea turtles, loggerhead sea turtles, and other animals. He goes to beaches where Kemp's ridleys nest to see these turtles and has participated in efforts to protect sea turtle nests and rehabilitate and release injured sea turtles back into the wild. The Center brings this action on behalf of its members.

16.     Plaintiff FRIENDS OF THE EARTH is a nonprofit organization with an office in

Oakland, California, and a headquarters in Washington, D.C. For more than 50 years, it has championed the causes of a clean and sustainable environment, protection of the nation's public lands and waterways, and the exposure of political malfeasance and corporate greed. Friends of the Earth's Oceans and Vessels Program works to fight industrialization of the ocean in all its forms, and has won regional, national, and international limits on air, water, and oil pollution from cruise ships, cargo ships, oil tankers, ferries, and recreational watercraft. Friends of the Earth has more than 237,000 members and 5.8 million activists, including members who live and recreate along the coastlines of the Gulf and the Atlantic seaboard. For example, one member (who is also a member of Sierra Club) owns property along and regularly visits the Gulf of Mexico with his family to fish and recreate. He enjoys fishing, surfing, viewing wildlife habitats, and visiting rescued turtles on South Padre Island. Friends of the Earth brings this action on behalf of its members.

17.    Plaintiff TURTLE ISLAND RESTORATION NETWORK (TIRN) is a nonprofit organization with offices in California and Texas. TIRN has been a leading advocate for the world's oceans and marine wildlife for more than 30 years. TIRN and its members work to protect and restore populations of endangered sea turtles and other vulnerable marine creatures—such as whales and dolphins—as well as marine biodiversity and ecosystems throughout the Gulf and along the Atlantic Coast. TIRN has over 200,000 members and supporters, including members who live and recreate along the Atlantic and Gulf coasts. For example, one member—a retired Superintendent of Flower Garden Banks National Marine Sanctuary in the Gulf—has lived at, studied, and dived in the Gulf for over 25 years. He regularly takes boat trips to various areas of the Gulf, including the Sanctuary, to SCUBA dive, participate in research, and look for sea turtles, Rice's whales, and other wildlife. TIRN brings this action on behalf of its members.

18.     Plaintiffs and Plaintiffs' members regularly use, enjoy, and benefit from the marine environment of the Gulf. Plaintiffs and Plaintiffs' members also regularly use, enjoy, and benefit from the presence of healthy marine life—including threatened and endangered species—within the Gulf for recreational, aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, boat touring, underwater diving, fishing, and photography. In addition, Plaintiffs and Plaintiffs' members regularly use, enjoy, and benefit from the presence of wildlife that migrate from the Gulf to the Chesapeake Bay and marine environments along the Atlantic Coast—including ESA-listed whales and sea turtles—for recreational, aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, boat touring, underwater diving, fishing, and photography. The ability of Plaintiffs and Plaintiffs' members to pursue these interests hinges not only on the well-being of threatened and endangered species that live, migrate, feed, and breed in areas affected by oil and gas activities in the Gulf, but also on the health of the marine ecosystems on which these species depend.

19.     NMFS's failure to comply with the ESA and APA has caused and is causing Plaintiffs' members procedural harms connected to their substantive conservation, recreational, scientific, and aesthetic interests. Plaintiffs' members rely on NMFS to comply with the requirements of the ESA to guide federal authorizations of Gulf oil and gas activities so as to protect endangered and threatened species from harmful effects of those activities. Interior authorizes Gulf oil and gas activities in reliance on the 2025 BiOp.

20.     The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by NMFS's violations of federal law, as described herein. These harms can only be remedied if the Court orders NMFS to comply with the ESA and APA. Plaintiffs have no

other adequate remedy at law.

21.    Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration with responsibility for administering and implementing the ESA with respect to marine species. Specifically, NMFS has responsibility under the ESA for sea turtles (while they are in the water), whales, sharks, rays, corals, and marine fish (including grouper, sawfish, and Gulf sturgeon). The principal offices of NMFS and the National Oceanic and Atmospheric Administration are located in Silver Spring, Montgomery County, Maryland.

22.    Defendant Eugenio Piñeiro Soler is sued in his official capacity as the Assistant Administrator for National Oceanic and Atmospheric Administration's National Marine Fisheries Service (known as NMFS). The Assistant Administrator is responsible for implementing and fulfilling NMFS's duties under the ESA. The office of the Assistant Administrator is located in Silver Spring, Montgomery County, Maryland.

## STATUTORY BACKGROUND

I.    ENDANGERED SPECIES ACT

23.    Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress defined "conservation" under the ESA as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"; that is, when the species has recovered and no longer needs the protection of the ESA. *Id.* § 1532(3).

24.    In broad strokes, the ESA seeks to protect and recover imperiled species and

populations by first listing them as threatened or endangered based on enumerated statutory factors. *Id.* § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further provides for the designation of protected critical habitat for threatened and endangered species. *Id.* § 1533(a)(3)(A)(i).

25.     Section 7(a)(2) of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2).

26.     The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. An agency must consult with the appropriate wildlife service—the U.S. Fish and Wildlife Service or, as here, NMFS—under Section 7 whenever it takes an action that "may affect" a threatened or endangered species or critical habitat. *Id.*; 50 C.F.R. § 402.14(a). In fulfilling the requirements of Section 7, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

27.     If the agency taking the action (the action agency) concludes the action may affect listed species or their critical habitats, it must initiate formal consultation with NMFS, unless the action agency determines and NMFS concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a), (b)(1).

28.     Formal consultation requires NMFS to 1) evaluate the current status and environmental baseline of affected species and critical habitats, 2) assess the effects of the action and cumulative effects on those species and habitats, and 3) analyze whether the effects of the action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. *Id.*

§ 402.14(g). At the conclusion of formal consultation, NMFS issues a biological opinion assessing the effects of the action and making a formal determination regarding whether the action is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(e), (h).

29.     Longstanding ESA regulations define "jeopardize the continued existence of" as, "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; *see also Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019) (confirming that "the plain language" of the regulation requires the Services "to assess 'both the survival *and* recovery of a listed species'" (quoting 50 C.F.R. § 402.02)).

30.     These regulations also define "destruction or adverse modification of critical habitat" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." 50 C.F.R. § 402.02.

31.     If NMFS concludes that the proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, it must propose reasonable and prudent alternatives (RPAs), if available, that will mitigate the proposed action to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.02, 402.14(h)(2). RPAs must 1) be capable of being implemented in a manner consistent with the intended purpose of the action, 2) be within the scope and authority of agency's jurisdiction, 3) be economically and technologically feasible, and 4) avoid the likelihood of jeopardizing the continued existence of the species. 50 C.F.R. § 402.02.

32.     Section 9 of the ESA prohibits "take" of endangered species by any person, which

includes federal agencies. 16 U.S.C. § 1538(a)(1). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19).

33.     If NMFS concludes that the proposed action (or an RPA) will not jeopardize a listed species or adversely modify its critical habitat, but will incidentally take members of a listed species, it must include with the biological opinion an "incidental take statement" that specifies the amount of take that may occur without causing jeopardy or adverse modification of critical habitat, as well as the measures required to limit take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). For ESA-listed marine mammals, any incidental take must have been first authorized under the Marine Mammal Protection Act (MMPA), and the incidental take statement must also include mitigation measures to comply with section 101(a)(5) of the MMPA (which requires that there be no more than a negligible impact on the species, among other restrictions). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1).

34.     An incidental take statement serves as a check on the biological opinion's assumptions and conclusions, and provides for monitoring. *Id.* § 402.14(i)(4). The amount of take set out in the incidental take statement acts as a trigger that, if exceeded, invalidates the safe harbor and requires the agencies to immediately reinitiate consultation. *Id.* § 402.14(i)(5); *see Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 269 (4th Cir. 2018) (stating incidental take statement sets a "'trigger' that, when reached, results in an unacceptable level of incidental take" (citation omitted)).

II.     OUTER CONTINENTAL SHELF LANDS ACT

35.     OCSLA governs the leasing, exploration, and development of oil and gas deposits on the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.*

§§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar 14, 1983).

36.    The Bureau of Ocean Energy Management (BOEM) is the federal agency within the Department of the Interior that manages these activities under OCSLA. 30 C.F.R. § 550.101. The Bureau of Safety and Environmental Enforcement (BSEE), also within the Department of the Interior, is the federal agency responsible for enforcing safety and environmental standards for offshore oil and gas activities and approving some activities. *Id.* § 250.101.

37.    OCSLA prescribes four stages for BOEM to lease and allow development of oil and gas deposits in the Outer Continental Shelf: 1) five-year leasing programs; 2) lease sales; 3) exploration plans; and 4) development and production plans. 43 U.S.C. §§ 1337, 1340, 1344, 1351.

38.    At the five-year program stage, BOEM proposes a schedule of lease sales over an upcoming five-year period. *Id.* § 1344(a).

39.    At the lease sale stage, BOEM offers for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain additional approvals. *Id.* § 1337.

40.    Lessees must obtain BOEM's approval of an Exploration Plan or Development Operations Coordination Document before they may commence exploration or production, respectively, on a lease. *Id.* §§ 1340, 1351; 30 C.F.R. § 550.201.

41.    Lessees also must obtain approval from BSEE before they may drill or install certain structures. 30 C.F.R. § 550.281.

III.    ADMINISTRATIVE PROCEDURE ACT

42.    The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

43.    The APA provides that the reviewing court "shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

**STATEMENT OF FACTS**

I.    THE GULF IS HOME TO THREATENED AND ENDANGERED WILDLIFE.

44.    The Gulf is home to some of the most productive and biodiverse tropical and temperate habitats in the United States, including coral reefs, wetlands, seagrass beds, mangroves, *Sargassum*, and hard- and soft-bottom marine communities. These ecosystems support thousands of species of fish, whales and dolphins, sea turtles, corals, and other animals. Many of the populations found in the Gulf are listed as endangered or threatened under the ESA.

45.    The Rice's whale, sperm whale, blue whale, sei whale, and North Atlantic right whale are found in the Gulf and listed as endangered. The Rice's whale—which is found nowhere else on Earth—is one of the most endangered whales in the world, due primarily to oil and gas activity in its habitat.

46.    All five sea turtle species found in the Gulf are listed as endangered or threatened: the Kemp's ridley sea turtle (the most endangered sea turtle in the world), hawksbill sea turtle, and leatherback sea turtle are listed as endangered, while the loggerhead sea turtle (Northwest Atlantic Distinct Population Segment [DPS])[1] and green sea turtle (North Atlantic DPS and South Atlantic DPS) populations in the Gulf are listed as threatened.

47.    Among the Gulf's fish species, the oceanic whitetip shark, giant manta ray, Gulf sturgeon, and Nassau grouper are listed as threatened, and the smalltooth sawfish is listed as

---

[1] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

endangered.

48.    Seven species of coral in the Gulf are listed as threatened: boulder star coral, lobed star coral, mountainous star coral, elkhorn coral, staghorn coral, rough cactus coral, and pillar coral. The queen conch is also listed as threatened.

49.    Additionally, critical habitat is designated in or along the Gulf for the loggerhead sea turtle, Gulf sturgeon, smalltooth sawfish, Nassau grouper, boulder star coral, lobed star coral, mountain star coral, pilar coral, rough cactus coral, elkhorn coral, and staghorn coral. NMFS has proposed designating critical habitat in the Gulf for the Rice's whale and green sea turtle.

## II.    HARMS TO WILDLIFE FROM OIL AND GAS ACTIVITIES REQUIRES ESA CONSULTATION.

50.    Federally approved oil and gas exploration, development, and production activities in the Gulf are extensive. Each year, oil and gas operators conduct hundreds of thousands of activities that adversely affect threatened and endangered species and their habitats in the Gulf, including but not limited to, drilling wells, constructing pipelines, installing entire subsea production systems, pumping oil and gas, and loading and transporting oil, gas, and cargo on ships. *See* Figure 1. These activities inflict harms to wildlife and the environment that include oil spills, vessel strikes, noise (from vessels, construction, and general operations), marine debris and other water pollution, and underwater explosions.

51.    Due to these effects, federal lease sales and authorizations pursuant to OCSLA are subject to the ESA's section 7 consultation requirements. *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).



**Figure 1** – Drilling platforms (orange dots), leases (boxes), and pipelines (red and purple lines) in federal waters in the Gulf as of February 2025 (source: BOEM ARCGIS Visual 1 – Active Leases and Infrastructure online interactive map)

52.     NMFS and Interior completed ESA consultations on Gulf oil and gas activities at several points in recent decades.

53.     In its 2007 biological opinion, NMFS predicted that oil spills from such activities would cause little harm. NMFS and Interior believed the largest spill possible would be *at most* 15,000 barrels, but that such a large spill was extremely unlikely.

54.     That prediction proved gravely wrong on April 20, 2010, when a series of human and mechanical failures culminated in an explosion that tore through the Deepwater Horizon oil drilling rig and caused the rig to sink and oil to gush from the seabed. Approximately 4.9 million barrels of oil—more than 325 times more than the worst-case scenario in the 2007 biological opinion—flowed into the Gulf over the next 87 days.

55.     The spill contaminated over 43,000 square miles of surface waters and over 1,300 miles of shoreline. Recent research indicates that toxic concentrations of invisible oil spread through the water column across an even larger area, extending past the Florida Keys and along the Atlantic Coast of Florida.

56.    Scientists estimate the spill killed or seriously harmed billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered.

57.    The spill's harm to marine species and the environment continues to this day, with long-term population declines, altered ecosystems, and persistent contamination.

58.    In late 2010, NMFS and Interior reinitiated formal consultation on federally authorized Gulf oil and gas activities under OCSLA, in light of new information from the Deepwater Horizon disaster. The agencies agreed that the spill had called into question the assumptions behind their analyses in previous consultations. Specifically, the agencies believed they had underestimated the size and likelihood of a catastrophic spill and needed to reassess how the Deepwater Horizon spill had altered the status of listed species and critical habitats.

59.    After several delays and, ultimately, litigation to compel NMFS to complete the consultation, NMFS issued the 2020 BiOp in April 2020.

60.    NMFS concluded in the 2020 BiOp that oil and gas exploration, development, and production in the Gulf would jeopardize the continued existence of the Rice's whale, but would not jeopardize any other listed species or adversely modify critical habitat. NMFS proposed an RPA that it asserted would prevent jeopardy to the Rice's whale.

III.    THE COURT FINDS THE 2020 BIOP UNLAWFUL.

61.    Plaintiffs filed a challenge to the 2020 BiOp in this Court on October 21, 2020. *Sierra Club v. NMFS*, No. 20-cv-3060 (D. Md.).

62.    On October 26, 2022, in the midst of summary judgment briefing, NMFS moved to pause the litigation because Interior had asked NMFS to reinitiate consultation to reevaluate the 2020 BiOp's oil spill risk analysis.

63.    Plaintiffs and NMFS eventually agreed to a stipulated stay until the reinitiated consultation and new biological opinion were completed, on the condition that Interior would

take certain actions to protect Rice's whales in the interim. However, industry intervenors blocked those protective actions through litigation in a different court. *Louisiana v. Haaland*, No. 23-cv-01157, 2023 WL 6450134 (W.D. La. Sept. 21, 2023), *aff'd on other grounds* 86 F.4th 663 (5th Cir. 2023). Plaintiffs accordingly moved to lift the stipulated stay, and the Court agreed, enabling summary judgment briefing to resume. *Sierra Club v. NMFS*, 711 F. Supp. 3d 522 (D. Md. 2024).

64.    On August 19, 2024, the Court granted Plaintiffs' motion for summary judgment, declared the 2020 BiOp in violation of the ESA and APA, ordered the 2020 BiOp vacated effective December 20, 2024, and remanded the matter to NMFS for further proceedings consistent with the opinion. *Sierra Club v. NMFS*, No. 20-cv-3060, 2024 WL 3860211 (D. Md. Aug. 19, 2024).

65.    The Court found the 2020 BiOp unlawful in seven main ways:

a.   NMFS failed to make an independent determination, as required by the ESA, on whether an oil spill larger than one million barrels (bbls) was unlikely to occur;

b.   The 2020 BiOp's conclusion that an oil spill larger than one million bbls is not an effect of the action was contrary to the evidence before NMFS;

c.   NMFS failed to evaluate the effects of very large oil spills (>10,000 bbls) on listed species;

d.   The jeopardy analyses for the Rice's whale and Gulf sturgeon arbitrarily assumed the species were still at their pre-Deepwater Horizon populations;

e.   NMFS failed to establish that the RPA would sufficiently reduce harm to Rice's whales to prevent jeopardy;

f.   NMFS unlawfully omitted anticipated incidental take from oil spills from the ITS.

g.  NMFS's surrogate in the ITS for monitoring incidental take from vessel strikes was irrational. *See generally id.*

66.  The Court ordered that, "[o]n remand, NMFS must address not only the flaws the Court identified but also any additional matters that may be raised on remand by the plaintiffs." *Id.* at *40 (cleaned up).

67.  NMFS subsequently notified the Court that it would not complete a new biological opinion by December 2024, as it had expected, but would need until May 21, 2025, to complete it. Defs.' Mot. Alter J., *Sierra Club v. NMFS*, No. 20-cv-3060 (D. Md. Sept. 16, 2024), ECF No. 211. NMFS accordingly asked the Court to modify the effective date of vacatur for the 2020 BiOp to May 21, 2025. *Id.* The Court granted the motion. Order, *Sierra Club v. NMFS*, No. 20-cv-3060 (D. Md. Oct. 21, 2024), ECF No. 220.

68.  Industry Intervenors, but not NMFS, appealed the summary judgment ruling to the Fourth Circuit, but asked the court to hold their appeal in abeyance until 21 days after NMFS issues a new BiOp or after May 21, 2025, whichever comes first. Mot. for Abeyance, *Sierra Club v. Am. Petroleum Inst.*, No. 24-01890 (4th Cir. Nov. 27, 2024). The Fourth Circuit granted that request. Order, *Sierra Club v. Am. Petroleum Inst.*, No. 24-01890 (4th Cir. Dec. 3, 2024).

IV.  **THE 2025 BIOP CONTAINS NUMEROUS FLAWS AND FAILS TO PROTECT ESA-LISTED SPECIES.**

69.  On May 21, 2025, NMFS issued its new "Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of America"—the 2025 BiOp.

70.  The 2025 BiOp covers "all activities regulated by the Bureaus and associated with the Outer Continental Shelf (OCS) Oil and Gas Program . . . in the Gulf of America" proposed to be taken by BOEM, BSEE, and other federal agencies involved with the program.

71.  The covered actions include all those associated both with previously issued oil

18

and gas leases, and with all new leases issued "through approximately 2029." Because leases have about a 40-year lifespan, the "opinion covers approximately 45 years of operations (i.e., five years of program implementation following the 2020 biological opinion)."

72.    NMFS concluded that the proposed action will jeopardize the continued existence of the Rice's whale, but determined that the imposition of several proposed mitigation measures through an RPA would prevent jeopardy. NMFS concluded the action will not jeopardize the continued existence of the sperm whale, Kemp's ridley sea turtle, loggerhead sea turtle (Northwest Atlantic DPS), green sea turtle (North Atlantic DPS), hawksbill sea turtle, leatherback sea turtle, Gulf sturgeon, or queen conch. NMFS further concluded the action will not adversely modify critical habitat for Gulf sturgeon or proposed critical habitat for the Rice's whale or green sea turtle North Atlantic DPS. NMFS also concluded that the proposed action is not likely to adversely affect the blue whale, sei whale, North Atlantic right whale, Nassau grouper, smalltooth sawfish, oceanic whitetip shark, giant manta ray, boulder star coral, elkhorn coral, lobed star coral, mountainous star coral, or critical habitat for the loggerhead sea turtle Northwest Atlantic DPS.

73.    Because the action is expected to incidentally take ESA-listed species, the 2025 BiOp includes an ITS covering the proposed action's incidental take of green sea turtles, Kemp's ridley sea turtles, loggerhead sea turtles, leatherback sea turtles, hawksbill sea turtles, and Gulf sturgeon.

74.    There are multiple legal and analytical flaws with the 2025 BiOp and ITS.

A.    Inadequate incidental take statement

75.    The ITS expressly does *not* cover incidental take of sperm whales or Rice's whales from activities other than geological and geophysical (G&G) surveys. Yet NMFS found that those other activities are expected to incidentally harm and kill individuals from both

species.

76.     The ITS also expressly does *not* cover incidental take resulting from oil spills or marine debris. Yet NMFS found that oil spills will occur as a result of the action and will harm and kill ESA-listed wildlife. And NMFS found that marine debris will be discharged as a result of the action and will harm and kill ESA-listed wildlife.

B.     Exclusion of a catastrophic oil spill from the effects analysis

77.     NMFS irrationally excluded a >1 million bbl spill from its analysis of the action's effects.

78.     The 2025 BiOp states, that "a worst-case, catastrophic spill . . . is not reasonably foreseeable over the next 45 years."

79.     However, the available scientific evidence—including evidence and NMFS's findings in the 2020 biological opinion—contradicts NMFS's conclusion.

80.     An extremely large spill, such as the Deepwater Horizon spill (~4.9 million barrels), is virtually certain to cause widespread, severe harms to ESA-listed species and critical habitats. The use of toxic dispersants and other spill response actions would further compound the damage.

81.     The probability of an extremely large spill is even higher than it was 15 years ago when the Deepwater Horizon disaster occurred and the agencies reinitiated consultation. Gulf drilling is moving into deeper waters, which increases the possibility of a catastrophic well blowout and extremely large oil spill. Additionally, hurricanes capable of causing severe damage to oil and gas facilities and triggering extremely large oil spills are increasing in frequency due to climate change. NMFS did not properly account for these heightened risks when it considered the probability of an extremely large spill.

82.     Despite identifying the need to reevaluate Interior's prior oil spill risk assessment

(which presumed a catastrophic spill would not occur) as the primary purpose of this reinitiated consultation, and despite NMFS's prior assessment in the 2020 BiOp that such a spill may occur as a result of the proposed action, the 2025 BiOp arbitrarily concludes that a catastrophic spill will not occur and fails to analyze the effects of such a spill on ESA-listed species.

C.    <u>Failure to account for climate-related population shifts in jeopardy and critical habitat analyses</u>

83.    Climate change will alter the population structure and distribution of threatened and endangered species in the foreseeable future. The 2025 BiOp acknowledges that in places. However, NMFS failed to account for how such changes will interact with the effects of the proposed action in its evaluation of whether the action is likely to jeopardize the survival or recovery of any species.

84.    Climate change is likely to make ESA-listed whale populations more susceptible to stressors caused by oil and gas development.

85.    For example, for sea turtles, climate change is expected to cause a shift in hatchling sex ratios, loss of nesting habitat, and change in the distribution and abundance of prey. Such changes are likely to make sea turtle populations more susceptible to the impacts of oil and gas development in the Gulf. NMFS did not, however, account for these changes in its jeopardy analysis for any species of sea turtle.

86.    NMFS did not account for the synergistic effects of climate change in its jeopardy or critical habitat analyses for any other species.

D.    <u>Legally insufficient reasonable and prudent alternatives</u>

87.    In its 2020 BiOp, NMFS concluded that the proposed action is likely to jeopardize the Rice's whale because of the "wide-ranging, combined multiple effects to the small and likely declining population" from five "combined stressors": vessel strikes, vessel noise, marine debris,

oil spills and dispersants, and sound from seismic surveys. There, NMFS explained that these stressors can cause mortality; along with chronic stress, behavioral disruption, significant masking, and hearing loss, "all of which are expected to reduce the fitness of individuals."

88.　　The RPA from the 2020 BiOp aimed at addressing vessel strike risk in the eastern Gulf is included as part of the environmental baseline in the 2025 BiOp.

89.　　In the 2025 BiOp, NMFS concluded that "the effects of exposure to sound from G&G survey activities and vessel noise, marine debris, and one large (100,000 bbl) oil spill" from the proposed action are not likely to jeopardize the Rice's whale's continued existence. NMFS concluded that the proposed action is likely to jeopardize the continued existence of the Rice's whale due to "the lethal and sub-lethal effects of vessel strike."

90.　　NMFS then proposed an RPA that purports to address vessel strikes. The RPA proposes: (1) the "[i]mediate[] . . . use [of] technology to enable Rice's whale vessel strike avoidance and monitoring of presence of Rice's whale"; (2) that "an expert working group" be established "to support development and implementation of a Rice's whale vessel strike avoidance technology plan" (i.e., "RW Tech Plan"); (3) that BOEM and BSEE, in coordination with NMFS an the working group, issue an assessment "of vessel strike risk of Rice's whale[s] in the Gulf" within one year; (4) that BOEM and BSEE, in coordination with NMFS and the working group, develop a "RW Tech Plan"; (5) that both the risk assessment and RW Tech Plan undergo "independent peer review"; (6) that the agencies begin implementing the RW Tech Plan within two years; and (7) monitoring of Rice's whales. The RPA further instructs that BOEM and BSEE should "modify the [RW Tech] Plan as needed such that the application of technologies to reduce vessel strikes, which may evolve over time, continues to ensure that the continued existence of Rice's whale is not likely jeopardized."

91.     NMFS predicted that full implementation of the RPA will reduce the number of lethal and sublethal vessel strikes to zero. NMFS asserted that "the proposed action, as revised by this RPA, is not likely to jeopardize the continued existence of the Rice's whale." However, NMFS offered no reasoned analysis for that assertion. NMFS based its conclusion on speculation. NMFS did not consider that the RPA is based on technology that does not yet exist, that the RPA consists of little more than a plan to make a plan, or that the agency has previously and repeatedly determined that implementing vessel speeds is the most effective way to reduce fatal collisions of large whales with vessels. NMFS also improperly delegated to BOEM and BSEE the authority to change the substance of the RPA.

92.     By failing to consider the efficacy of the proposed RPA, NMFS failed to rationally consider whether the proposed RPA will prevent jeopardy of the Rice's whale.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – The Incidental Take Statement Is Arbitrary and Capricious and Contrary to the ESA, in Violation of the APA and ESA

93.     The allegations made in paragraphs 1–92 are realleged and incorporated by this reference.

94.     Section 7 of the ESA requires each federal agency, in consultation and with the assistance of the expert fish and wildlife agency, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" which has been designated as critical habitat. 16 U.S.C. § 1536(a)(2). Such consultations must use the best available scientific information. *Id.*

95.     In a formal consultation, NMFS, as the expert wildlife agency, must review all relevant information and issue a biological opinion evaluating the action's effects on the listed

species and critical habitat, and making jeopardy and adverse modification determinations. *Id.*
§ 1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

96.     Section 7(b)(4) of the ESA requires NMFS to issue an incidental take statement
whenever a proposed federal agency action will not jeopardize a protected species but will result
in incidental take of members of the species. 16 U.S.C. § 1536(b)(4).

97.     An incidental take statement must "[s]pecif[y] the impact of incidental taking as
the amount or extent of such taking" the species. 50 C.F.R. § 402.14(i)(1)(i). Where the agency
establishes that it cannot numerically quantify take, the statement may employ a "surrogate" to
express the amount of take, but the surrogate must include "a clear standard for determining
when the level of anticipated take has been exceeded." *Id.* If the amount of specified take is
exceeded, the action agency "must reinitiate consultation immediately" with NMFS. *Id.*
§ 402.14(i)(5).

98.     NMFS's 2025 BiOp and ITS is a final agency action as defined by the APA, for
which there is no other adequate remedy in a court.

99.     NMFS concluded the proposed action will cause lethal and nonlethal take of
Rice's whales, sperm whales, Kemp's ridley sea turtles, loggerhead sea turtles (Northwest
Atlantic DPS), green sea turtles (North Atlantic DPS), hawksbill sea turtles, leatherback sea
turtles, and Gulf sturgeon.

100.    NMFS failed to include incidental take of Rice's whales and sperm whales from
sources other than G&G activities in the 2025 BiOp's ITS. NMFS did not account for, minimize,
require the reporting of, or authorize take of Rice's whales or sperm whales as required by the
ESA.

101.    NMFS failed to include incidental take from oil spills or marine debris expected

to result from the proposed action in the 2025 BiOp's ITS. NMFS did not account for, minimize, require the reporting of, or authorize take from oil spills or marine debris as required by the ESA.

102.    NMFS's inclusion of an inadequate ITS in the 2025 BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION – The Programmatic Biological Opinion Is Arbitrary and Capricious and Contrary to Law, in Violation of the APA and ESA**

103.    The allegations made in paragraphs 1–102 are realleged and incorporated by this reference.

104.    The ESA and its implementing regulations require NMFS, in making its jeopardy determination, to evaluate the current status and environmental baseline of affected species and critical habitats, to assess the effects of the action and cumulative effects on those species and habitats, and to analyze whether the effects of the action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 50 C.F.R. § 402.14(g).

105.    NMFS's analyses of the likelihood of jeopardy and adverse modification are arbitrary and capricious and contrary to law for multiple reasons.

106.    NMFS improperly and arbitrarily concluded that a catastrophic oil spill is not likely to result from the proposed action. NMFS failed to consider relevant factors or use the best available science in reaching that conclusion. As a result, NMFS failed to consider such a spill in analyzing whether the proposed action will jeopardize the continued existence of ESA-listed species or adversely modify designated critical habitat in the Gulf.

107.    NMFS arbitrarily and improperly failed to account for how climate change-related alterations to the population structures and distributions of threatened and endangered species

will interact with the effects of the proposed action when analyzing whether the action would jeopardize ESA-listed species or cause adverse modification to critical habitat. NMFS further failed to use the best available science on how climate change will affect threatened and endangered species and their habitats in the Gulf.

108.    NMFS's conclusions that the proposed action will not jeopardize the continued existence of the Kemp's ridley sea turtle, loggerhead sea turtle (Northwest Atlantic DPS), green sea turtle (North Atlantic DPS), leatherback sea turtle, hawksbill sea turtle, or Gulf sturgeon, or adversely modify the critical habitat for the Gulf sturgeon or proposed critical habitat for the Rice's whale or green sea turtle (North Atlantic DPS) are not based on any rational scientific analyses, nor do they consider all relevant factors or use the best available science.

109.    If NMFS concludes that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, the ESA requires NMFS to propose RPAs that will mitigate the proposed action so as to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.02, 402.14(h)(2). RPAs must 1) be capable of being implemented in a manner consistent with the intended purpose of the action, 2) be within the scope and authority of agency's jurisdiction, 3) be economically and technologically feasible, and 4) avoid the likelihood of jeopardizing the continued existence of the species. 50 C.F.R. § 402.02.

110.    NMFS concluded the lethal and sub-lethal effects of vessel strikes are likely to jeopardize the Rice's whale.

111.    The agency's jeopardy analysis, however, underestimates the magnitude of the harm for which the RPA must compensate to avoid jeopardy. Further, NMFS failed to explain its change in position from the 2020 BiOp that the effects of oil spills and dispersants, sound from

seismic surveys, vessel noise, and marine debris from the proposed action also likely jeopardize the continued existence of the Rice's whale.

112.    NMFS proposed an RPA purporting to mitigate harm from vessel strikes. NMFS failed to rationally analyze or establish that the RPA will sufficiently mitigate the harm from vessel strikes to avoid jeopardy. NMFS further failed to establish that the stressors left unmitigated by the RPA will not cause jeopardy to the Rice's whale.

113.    NMFS's 2025 BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that the 2025 BiOp and ITS violate the ESA, its implementing regulations, and the APA;

2.    Vacate the 2025 BiOp;

3.    Vacate the ITS, in full or in part;

4.    Remand the action to NMFS and order it to prepare a sufficiently protective biological opinion within six months;

5.    Grant any injunctive relief necessary to protect ESA-listed species that are subject of the BiOp;

6.    Maintain jurisdiction over this action until NMFS is in compliance with the ESA, APA, and every order of this Court;

7.    Award Plaintiffs their costs and reasonable attorney fees pursuant to 5 U.S.C. § 552(a)(4)(E) or 28 U.S.C. § 2412; and

8.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 20th day of May, 2025.

/s/ Christopher D. Eaton
Christopher D. Eaton (D. MD Bar 21544)
Steve Mashuda (*pro hac vice* forthcoming)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
ceaton@earthjustice.org
smashuda@earthjustice.org

Ava Ibanez Amador (*pro hac vice* forthcoming)
EARTHJUSTICE
48 Wall St., 15th Floor
New York, NY 10005
212-845-7376 Telephone
alamador@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Center for
Biological Diversity, Friends of the Earth, and
Turtle Island Restoration Network*