# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SIERRA CLUB et al., | |
| *Plaintiffs,* | No. 8:25-cv-01627-DLB |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE et al., | |
| *Defendants,* | |
| CHEVRON U.S.A. INC. | |
| *Intervenor-Defendant,* | |
| and | |
| AMERICAN PETROLEUM INSTITUTE et al., | |
| *Intervenor-Defendants.* | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

LIST OF ACRONYMS & ABBREVIATIONS ......................................................................... vii

INTRODUCTION ............................................................................................................. 1

STATUTORY FRAMEWORK ................................................................................................ 2

FACTUAL BACKGROUND ................................................................................................. 4

    I.    Extensive Gulf Oil and Gas Operations Harm Imperiled Wildlife. ................................. 4

    II.    NMFS Has Repeatedly Failed to Assess the Full Scope of Foreseeable Impacts or Apply Legally Required Protections under the ESA. ................................... 5

    III.   NMFS Publishes a New BiOp that Repeats the Same Errors and Makes New Ones. ............................................................................................................ 6

STANDARD OF REVIEW ................................................................................................... 7

ARGUMENT ................................................................................................................... 8

    I.    Conservation Groups Have Standing. ................................................................. 8

    II.    NMFS Failed to Consider the Full Scope of Reasonably Foreseeable Effects to Species. ....................................................................................................... 9

        A.    NMFS Arbitrarily Disregarded the Likelihood and Effects of a ≥1 MMbbl Oil Spill. ..................................................................................................... 9

            1.  NMFS Misinterpreted the Ji Study. ................................................... 9

            2.  NMFS Arbitrarily Discarded Its Prior Catastrophic Spill Findings ................. 12

            3.  NMFS Ignored Its Findings that Catastrophic Spill Risk Is Increasing .......... 14

        B.    NMFS Failed to Consider the Effects from Other Reasonably Foreseeable Oil Spills. ..................................................................................................... 15

            1.  NMFS's Decision to Analyze a Single 100,000 bbl Spill Was Based on a Math Error and Is Otherwise Arbitrary. ................................................... 16

            2.  NMFS Improperly Excluded All Foreseeable Spills Except One from the Scope of Effects. ...................................................................... 18

            3.  BOEM's Oil Spill Analyses Are Based on Incorrect Assumptions and Flawed Data. ............................................................................... 19

C. NMFS Underestimated the Likelihood and Effects of Vessel Strikes.....................21

    1. NMFS Wrongly Assumed Oil and Gas Vessel Traffic Will Not Increase. ..........................................................................................22

    2. NMFS Arbitrarily Discounted the Number of Fatal Rice's Whale Strikes. ...........................................................................................23

    3. NMFS Underestimated Vessel Strikes to Sea Turtles. ...................24

D. NMFS Arbitrarily Dismissed Harms from G&G Surveys..................25

III. NMFS's Jeopardy Conclusions Are Arbitrary and Contrary to Law. ........................... 28

A. NMFS Arbitrarily Dismissed the Combined Effect of Multiple Stressors on the Rice's Whale Population..................................................................28

B. NMFS's Jeopardy Analyses Fail to Account for Climate Impacts to the Environmental Baseline. ......................................................................31

C. NMFS's Assertions that the Action Will Not Jeopardize the Recovery of Species Are Illogical and Counter to the Record..................................33

IV. The Reasonable and Prudent Alternative Fails to Ensure that the Action Will Not Jeopardize the Rice's Whale and Violates the ESA. ........................................................ 35

A. NMFS's RPA Conclusion Fails to Account for the Full Scope of Harm. ............36

B. NMFS Failed to Demonstrate the RPA is Sufficient to Avoid Jeopardy from Even the Unreasonably Small Number of Vessel Strikes NMFS Estimated..........................................................................................36

V. The BiOp Lacks a Legally Sufficient Incidental Take Statement. ................................. 39

A. The ITS Fails to Comply with the ESA's Requirements for Whales. ...................39

B. The ITS Unlawfully Fails to Specify the Amount and Extent of Expected Take from Oil Spills and Marine Debris...............................................42

VI. The Court Should Vacate the BiOp and ITS. .................................................................. 43

CONCLUSION............................................................................................. 44

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alaska v. Lubchenco*,
   723 F.3d 1043 (9th Cir. 2013) ...................................................................................36

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ...................................................................................43

*Am. Great Lakes Ports Ass'n v. Schultz*,
   962 F.3d 510 (D.C. Cir. 2020) ...................................................................................44

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ...........................................................................29

*\*Appalachian Voices v. U.S. Dep't of Interior*,
   25 F.4th 259 (4th Cir. 2022) .............................................................................. *passim*

*Ctr. for Biological Diversity v. Bernhardt*,
   595 F. Supp. 3d 890 (D. Ariz. 2022) ..........................................................................31

*Ctr. for Biological Diversity v. Bernhardt* (*Bernhardt 2020*),
   982 F.3d 723 (9th Cir. 2020) ...........................................................................37, 39, 42

*Ctr. for Biological Diversity v. Haaland*,
   998 F.3d 1061 (9th Cir. 2021) ...................................................................................13

*Ctr. for Biological Diversity v. NOAA Fisheries*,
   644 F. Supp. 3d 574 (N.D. Cal. 2022) ........................................................................40

*Ctr. for Biological Diversity v. Raimondo*,
   610 F. Supp. 3d 252 (D.D.C. 2022) ......................................................................40, 41

*Ctr. for Biological Diversity v. Regan*,
   734 F. Supp. 3d 1 (D.D.C. 2024) ...............................................................................43

*Ctr. for Biological Diversity v. Ross*,
   480 F. Supp. 3d 236 (D.D.C. 2020) ...........................................................................40

*Ctr. For Biological Diversity v. Ross* (*Ross I*),
   613 F. Supp. 3d 336 (D.D.C. 2020) ................................................................40, 41, 42

*Ctr. for Biological Diversity v. Rumsfeld*,
   198 F. Supp. 2d 1139 (D. Ariz. 2002) ........................................................................37

*\* Authorities upon which we chiefly rely are marked with an asterisk*

*Ctr. for Biological Diversity v. Salazar*,
   804 F. Supp. 2d 987 (D. Ariz. 2011) .......................................................................................34

*Ctr. for Biological Diversity v. Salazar* (*Salazar 2012*),
   695 F.3d 893 (9th Cir. 2012) ......................................................................................39, 40, 43

*Ctr. For Native Ecosystems v. U.S. Fish & Wildlife Serv.*,
   795 F. Supp. 2d 1199 (D. Colo. 2011)....................................................................................30

*\*Defs. of Wildlife v. U.S. Dep't of Interior*,
   931 F.3d 339 (4th Cir. 2019) ................................................................................... *passim*

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015)...................................................................................................20

*\*Dow AgroSciences LLC v. NMFS*,
   707 F.3d 462 (4th Cir. 2013) ...............................................................................12, 22, 26, 43

*Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*,
   864 F.3d 738 (D.C. Cir. 2017).................................................................................................23

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002)..................................................................................................33

*Greenpeace v. NMFS*,
   80 F. Supp. 2d 1137 (W.D. Wash. 2000).................................................................................30

*Humane Soc'y of U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) .................................................................................. *passim*

*Long Island Power Auth. v. FERC*,
   27 F.4th 705 (D.C. Cir. 2022)...................................................................................................43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................................................7, 11

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*,
   460 F. Supp. 3d 1030 (D. Mont. 2020)....................................................................................44

*Nat. Res. Def. Council, Inc. v. Rauch*,
   244 F. Supp. 3d 66 (D.D.C. 2017).....................................................................................20, 27

*Nat'l Parks Conservation Ass'n v. Semonite*,
   422 F. Supp. 3d 92 (D.D.C. 2019)...........................................................................................44

*Nat'l Wildlife Fed'n v. NMFS*,
   184 F. Supp. 3d 861 (D. Or. 2016) .........................................................................................31

iv

*Nat'l Wildlife Fed'n v. NMFS*,
  839 F. Supp. 2d 1117 (D. Or. 2011) ....................................................................37

*Oceana, Inc. v. Ross*,
  No. 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ..................................32, 43

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ........................................................................12, 14

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005) .................................................................35, 36, 39

*S. Yuba River Citizens League v. NMFS*,
  723 F. Supp. 2d 1247 (E.D. Cal. 2010)................................................................28

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ........................................................................35, 39

*\*Sierra Club v. NMFS* (*2020 BiOp*),
  Civ. No. 20-3060, 2024 WL 3860211 (D. Md. Aug. 19, 2024) ..................... *passim*

*Sierra Club v. NMFS*,
  711 F. Supp. 3d 522 (D. Md. 2024)......................................................................10

*Sierra Club v. NMFS*,
  Civ. No. 20-3060, 2024 WL 6817999 (D. Md. Oct. 21, 2024) .......................6, 7, 44

*Sierra Club v. Salazar*,
  177 F. Supp. 3d 512 (D.D.C. 2016) .....................................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  909 F.3d 635 (4th Cir. 2018) ..............................................................................43

*Sierra Club v. U.S. Dep't of the Interior* (*Sierra Club v. Interior*),
  899 F.3d 260 (4th Cir. 2018) .................................................................39, 42, 43

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978).............................................................................................2

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016)........................................................................22, 26

*Wash. Toxics Coal. v. EPA*,
  413 F.3d 1024 (9th Cir. 2005) ............................................................................42

*Wild Fish Conservancy v. Irving*,
  221 F. Supp. 3d 1224 (E.D. Wash. 2016)........................................................31, 32

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ...............................................................................33, 34, 35

*Willamette Riverkeeper v. NMFS,*
    763 F. Supp. 3d 1203 (D. Or. 2025) ...........................................................................32, 33

**Statutes**

16 U.S.C. § 1371 ...............................................................................................................39

16 U.S.C. § 1536 ...................................................................................................... *passim*

**Regulations**

30 C.F.R. pts. 550-560 ........................................................................................................5

50 C.F.R. § 402.02 ................................................................................................... *passim*

50 C.F.R. § 402.14 ...............................................................................................3, 29, 39, 40

**Federal Register**

84 Fed. Reg. 15446 (Apr. 15, 2019) ..............................................................................4, 5

85 Fed. Reg. 48332 (Aug. 20, 2020)...................................................................................4

## LIST OF ACRONYMS & ABBREVIATIONS

| | | |
|---|---|---|
| APA | | Administrative Procedure Act |
| bbl | | Barrels |
| | Bbbl | Billions of barrels |
| | MMbbl | Millions of barrels |
| | Large Spill | $\geq$1,000 bbl |
| | Very Large Spill | $\geq$10,000 bbl |
| | Extremely Large Spill | $\geq$1,000,000 bbl ($\geq$1 MMbbl) |
| BiOp | | Biological Opinion |
| BOEM | | Bureau of Ocean Energy Management |
| BSEE | | Bureau of Safety and Environmental Enforcement |
| DWH | | Deepwater Horizon |
| ESA | | Endangered Species Act |
| G&G | | Geological and Geophysical |
| ITS | | Incidental Take Statement |
| NMFS | | National Marine Fisheries Service |
| OCS | | Outer Continental Shelf |
| PTS | | Permanent Threshold Shift |
| RPA | | Reasonable and Prudent Alternative |
| TTS | | Temporary Threshold Shift |

**INTRODUCTION**

Just over a year ago, this Court found numerous errors and legal violations in the National Marine Fisheries Service's (NMFS) 2020 programmatic biological opinion (BiOp) for the federal oil and gas program in the Gulf of Mexico. NMFS has now produced a new BiOp that perpetuates many of the same flaws, while also making new errors. The result is maintenance of the status quo: where the oil and gas industry is permitted to continue activities that put the critically endangered Rice's whale and other imperiled species at risk of extinction without any meaningful added protections.

The Rice's whale has no time to lose. According to NMFS's current best estimate, only 51 individuals remain. Just a single fatality from oil and gas activities could trigger a population collapse. The BiOp acknowledges this likelihood of jeopardy to the species' continued existence. Yet NMFS's response was to discount or dismiss most of the threats and to allow vessels—the one source of harm it purported to address—to continue speeding through the whale's habitat while simply outlining a plan to make a plan to address the risk someday. The Endangered Species Act (ESA) does not permit NMFS to entrust the species' survival and recovery to speculation. It mandates *ensuring* that the oil and gas program will not jeopardize the existence of any imperiled species. NMFS has not done that.

In fact, the BiOp stumbles from the gate by failing to include the full scope of impacts from the program. As it has done since before the 2010 *Deepwater Horizon* (*DWH*) disaster, NMFS continues to brush off the likelihood of a catastrophic oil spill. This time around, it also disregarded all other potential oil spills except one over the next 45 years, the period of activity covered by the BiOp. And even though vessel strikes and Geological and Geophysical (G&G) surveys are a pervasive threat, particularly to Rice's whales, NMFS both underestimated and arbitrarily discounted their harm to species.

Then, when it came time to add the action's effects to the environmental baseline to determine whether the action is likely to jeopardize any species, NMFS conducted improper analyses. For Rice's whales, it inexplicably and arbitrarily reversed course on its 2020

1

conclusions that vessel noise, marine debris, oil spills, and G&G surveys contribute to jeopardy to now baselessly claim they do not. For all species, NMFS wrongly assumed populations will experience the effects of the action in a world without climate change. And NMFS illogically concluded that oil and gas activity will not jeopardize the recovery of species even after citing species recovery plans finding that oil and gas activity *will* prevent recovery.

In addition to proposing an unlawful and inadequate Reasonable and Prudent Alternative (RPA) to address Rice's whale jeopardy, NMFS authorized oil and gas activities to incidentally harm and kill listed species with an incidental take statement (ITS) that plainly violates the ESA. As in the 2020 BiOp, the ITS fails to comply with the ESA's requirements for incidental take of marine mammals. And NMFS doubled down on its omission of anticipated oil spill take from the ITS by omitting anticipated marine debris take as well. As a result, the ITS does not place necessary, legally required limits, mitigation, or monitoring requirements on harms from oil spills or trash or most harm to Rice's whales and sperm whales.

The BiOp is arbitrary and capricious and violates the ESA in multiple respects. Plaintiff Conservation Groups accordingly ask the Court to vacate and remand the BiOp and ITS to NMFS to produce a legally compliant BiOp that sufficiently protects Gulf wildlife from one of the greatest threats to their survival and recovery.

## STATUTORY FRAMEWORK

Congress enacted the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Federal agencies accordingly are required "'to afford first priority to the declared national policy of saving endangered [or threatened] species'—even when this goal conflicts with agencies' 'primary missions.'" *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 264 (4th Cir. 2022) (alteration in original) (quoting *Hill*, 437 U.S. at 185).

Section 7(a)(2) of the ESA requires every federal agency, in consultation with the relevant federal wildlife agency—here, NMFS—to "*insure* that any action authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any

2

endangered species or threatened species." 16 U.S.C. § 1536(a)(2) (emphasis added). To "jeopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. If an agency action is likely to adversely affect a listed species, the agency must formally consult with NMFS, culminating in NMFS's "'biological opinion' on whether that action, in light of the relevant environmental context, 'is likely to jeopardize the continued existence of [those] species.'" *Appalachian Voices*, 25 F.4th at 264 (alteration in original) (quoting 50 C.F.R. § 402.14(g)); *see* 16 U.S.C. § 1536(b)(3)(A).

NMFS may not "conduct[] its 'jeopardy analysis in a vacuum,'" otherwise "a listed species could be gradually destroyed, so long as each step on the path to destruction [i]s sufficiently modest." *Appalachian Voices*, 25 F.4th at 269 (citation omitted). "The [ESA] guards against this danger by requiring [NMFS] to formulate its biological opinion in three primary steps." *Id.* First, NMFS "must '[r]eview *all* relevant information provided by the [action] agency or *otherwise available.*'" *Id.* (alterations in original) (quoting 50 C.F.R. § 402.14(g)(1)). Second, it "must '[e]valuate' four different categories of information: (1) the 'current status' of the listed species; (2) the 'environmental baseline'; (3) the 'cumulative effects' of non-federal action; and (4) the 'effects of the [agency] action.'" *Id.* at 270 (alterations in original) (quoting 50 C.F.R. § 402.14(g)(2), (3)). And third, NMFS "must '*[a]dd* the effects of the action and cumulative effects to the environmental baseline and[,] *in light of* the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of [the] listed species.'" *Id.* at 271 (alterations in original) (quoting 50 C.F.R. § 402.14(g)(4)). If NMFS concludes that the proposed action is likely to jeopardize a listed species, it must propose an RPA, if available, that will sufficiently mitigate the action to avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(2). NMFS must "use the best scientific and commercial data available" throughout this process. 16 U.S.C. § 1536(a)(2); *see Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 345-46 (4th Cir. 2019).

Section 9 of the ESA prohibits the "take" of any listed species, which is defined in

3

relevant part to mean to "harass, harm, . . . wound, [or] kill." 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). Section 7 requires NMFS to include an ITS with a BiOp whenever the action will cause incidental take of a species. *Id.* § 1536(b)(4). "Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. The ITS must specify the amount of incidental take and measures required to limit take. *Id.* § 402.14(i)(1). The ESA imposes additional procedural and substantive requirements for an ITS when incidental take of marine mammals is anticipated. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1)(iii). Incidental take consistent with a lawful ITS is shielded from section 9 liability. 16 U.S.C. § 1536(o)(2).

## FACTUAL BACKGROUND

### I.     Extensive Gulf Oil and Gas Operations Harm Imperiled Wildlife.

The Gulf is home to dozens of species listed as threatened or endangered under the ESA. NMFS_156-262. NMFS has identified offshore oil and gas activities as one of the primary threats to the existence and recovery of several species. *E.g.*, 85 Fed. Reg. 48332, 48357-58 (Aug. 20, 2020) (leatherback sea turtle); 84 Fed. Reg. 15446 (Apr. 15, 2019) (Rice's whale); NMFS_98337-38 (Kemp's ridley sea turtle).

Gulf wildlife must swim through a gauntlet of deafening, polluting, and dangerous oil and gas operations pervading most of the Gulf as they attempt to feed, reproduce, and survive. As of February 2025, nearly 12 million acres of the Gulf were under lease for oil and gas development. NMFS_42. More than 1,000 active platforms and 15,000 miles of pipelines are spread across the Gulf. NMFS_95, 510, 534. Exploration and development continue to expand, with hundreds of wells drilled every year. NMFS_43.

Oil and gas service vessels travel tens of millions of kilometers per year, making up about half the total vessel traffic in the Gulf. NMFS_368. Rice's whales are particularly susceptible to being struck by vessels because they are slow-moving and tend to rest just below the surface, especially at night when vessels cannot see them. NMFS_371-72, 107577, at PDF p. 7. Vessel strikes are an existential threat to the Rice's whale because the death of just "a single individual

could drive the species to extinction." NMFS_35307.

The Gulf is an incredibly noisy place. Seismic air guns conducting G&G surveys emit blasts "roughly as loud as volcanic eruptions," NMFS_107585, at PDF p. 123, which "dominate[] the ambient soundscape," NMFS_267. In just one year, these surveys can cover enough track-miles to circle the earth. *See, e.g.*, NMFS_2737. The loud surroundings interfere with the ability of whales and sea turtles to communicate, feed, and mate, and can even cause hearing loss and reduced fitness leading to death. NMFS_404-13.

Oil spills are a routine occurrence. About 50 spills occur each year on average from platforms and pipelines. NMFS_107561, at PDF p. 86. Four spills since 2004 have been larger than 10,000 barrels (bbl). NMFS_507, 519. The risk of a loss of well control is significantly higher in the Gulf than in the rest of the world. NMFS_61210. Such an event caused the worst spill in U.S. history, when the *DWH* rig exploded and spilled 4.9 million bbl (MMbbl) of oil that killed or seriously harmed over 100,000 ESA-protected animals. NMFS_277, 280-90. The Gulf and its wildlife have yet to recover. *Id.*

## II.   NMFS Has Repeatedly Failed to Assess the Full Scope of Foreseeable Impacts or Apply Legally Required Protections under the ESA.

Two bureaus in the Department of the Interior—the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) (collectively, the Bureaus)—authorize and regulate the leasing, exploration, development, and production of oil and gas in the Gulf's federal waters under the Outer Continental Shelf Lands Act. 43 U.S.C. § 1331 *et seq.*; 30 C.F.R. pts. 550-560. The Bureaus' actions require consultation under ESA section 7 because they adversely affect ESA-listed species and their habitats.

The Court is familiar with the history of consultation on the Gulf oil and gas program. *See Sierra Club v. NMFS* (*2020 BiOp*), Civ. No. 20-3060, 2024 WL 3860211, at *1-4 (D. Md. Aug. 19, 2024). A common theme in the last two programmatic BiOps (2007 and 2020) has been the agencies' assurances that a catastrophic oil spill will not happen. The *DWH* disaster proved the 2007 BiOp's prediction wrong on that front, yet the Bureaus repeated (and NMFS acquiesced

5

to) the same prediction in the 2020 BiOp. *Id.* at *8. Because the 2020 BiOp neither covered the effects of a catastrophic spill nor accounted for how the *DWH* spill affected wildlife populations, among other flaws, Conservation Groups challenged it in this Court. *Id.* at *3.

After briefing was underway, the Bureaus asked NMFS to reinitiate consultation to reevaluate oil spill risk. *Id.* Conservation Groups and NMFS reached an agreement to stay the case pending completion of the reinitiated consultation, but action by Intervenors to negate the agreement's interim Rice's whale protections compelled the Groups to resume litigation. *Id.*

On August 19, 2024, the Court ruled that the 2020 BiOp violated the ESA and the Administrative Procedure Act (APA) in seven ways: 1) NMFS unlawfully deferred to the Bureaus' conclusion that a ≥1 MMbbl spill is not reasonably foreseeable; 2) that conclusion was contrary to record evidence; 3) NMFS failed to analyze the discrete effects of reasonably foreseeable very large (≥10,000 bbl) spills; 4) NMFS failed to account for post-*DWH* changes to Rice's whale and Gulf sturgeon populations; 5) NMFS failed to establish that the RPA would sufficiently alleviate harm from vessel strikes or any other stressor to avoid jeopardy to the Rice's whale; 6) the ITS unlawfully omitted anticipated oil spill take; and 7) the ITS's measure for monitoring vessel strike take was arbitrary and capricious. *Id.* at *6-36. Accordingly, the Court remanded the BiOp to NMFS to "address not only the flaws the Court identified but also any additional matters that may be raised on remand by the plaintiffs." *Id.* at *40 (citation omitted) (cleaned up). The Court found it unnecessary to reach several of Conservation Groups' arguments because NMFS could address them "in the renewed agency process." *E.g.*, *id.* at *12 (citation omitted). The Court found the errors serious enough to require vacatur of the BiOp, but deferred vacatur until December 21, 2024, and then May 21, 2025, the date by which NMFS indicated it would produce a new BiOp. *Id.* at *36–40; *Sierra Club v. NMFS*, Civ. No. 20-3060, 2024 WL 6817999 (D. Md. Oct. 21, 2024).

## III.    NMFS Publishes a New BiOp that Repeats the Same Errors and Makes New Ones.

On May 20, 2025, NMFS published the BiOp at issue here. NMFS_1-701. The BiOp covers all "actions associated with all past leases operating in the Gulf of America at the time

this opinion [wa]s issued, regardless of when the lease was awarded, and actions associated with new leases awarded" from 2010 through 2029. NMFS_26. It covers "approximately 45 years of operations" on those leases. *Id.* NMFS determined the oil and gas program is likely to jeopardize the continued existence of the Rice's whale due solely to vessel strike risk. NMFS_572. It concluded the program will not jeopardize any other species. NMFS_598. To address Rice's whale jeopardy, NMFS proposed an RPA consisting of a plan to 1) identify a whale monitoring app that vessel operators may use, 2) conduct further research on strike risk, and 3) develop a "tech plan" that could aid in whale vessel strike avoidance. NMFS_601-02. NMFS found that oil spills, marine debris, vessel strikes, G&G surveys, and other types of noise from the program will harm Rice's whales, sperm whales, sea turtles, and Gulf sturgeon. NMFS_359-550. It produced an ITS, however, that does not include take from oil spills or marine debris or the take of whales from any stressor other than G&G surveys. NMFS_609-20. Conservation Groups filed a timely challenge to the BiOp. ECF Nos. 1, 32.

## STANDARD OF REVIEW

Courts review a challenge to a BiOp under the "general standard of review of agency action established by" the APA. *Appalachian Voices*, 25 F.4th at 268 (citation omitted). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation omitted). While review under this standard is deferential, courts "must conduct a 'searching and careful' review to determine whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Appalachian Voices*, 25 F.4th at 269 (citation omitted).

**ARGUMENT**

The ESA requires NMFS to formulate its biological opinion in three primary steps. First, NMFS had to review all relevant information. *Id.* Second, it had to evaluate the current status of the species, the environmental baseline, cumulative effects of other actions, and the full scope of the action's effects. *Id.* at 270. Then it had to add the full effects of the action and the cumulative effects to the environmental baseline—the present and future environmental context—to determine whether the action may jeopardize the survival *or* recovery of each species. *Id.* at 271.

NMFS began by making errors when evaluating the effects of the action, significantly underestimating the degree of harm from oil spills, vessel strikes, and G&G surveys. Those errors caused NMFS to underestimate the risk of jeopardy caused by the action's effects. NMFS made additional errors at the jeopardy step, too, reaching arbitrary conclusions about the degree to which the action will jeopardize the Rice's whale, failing to account for climate change in the environmental baseline, and reaching illogical conclusions about jeopardy to the recovery of species. Finally, NMFS failed to comply with the ESA's requirements when proposing an RPA to address jeopardy to the Rice's whale and when producing an ITS covering incidental take.

The serious errors at every step resulted in a BiOp that fails to ensure against jeopardy or require necessary mitigation. Conservation Groups accordingly ask the Court to vacate and remand the BiOp and ITS.

I.    **Conservation Groups Have Standing.**

As a threshold matter, Conservation Groups have associational standing for the same reasons this Court found they had standing in the 2020 BiOp case. *2020 BiOp*, 2024 WL 3860211, at *20-27. As there, the aesthetic and recreational interests of the Groups' members will be harmed by an unlawful BiOp. Members live along and/or recreate in the Gulf—boating, fishing, paddle boarding, swimming, surfing, scuba diving, observing wildlife, and taking photographs. Decl. of R. Wiygul ¶¶ 8-10, 13-16, 18, Ex. A; Decl. of G. Schmahl ¶¶ 5-6, Ex. B; Decl. of W. Foster ¶¶ 4-9, Ex. C; Decl. of J. Steinhaus ¶ 6, Ex. D; Decl. of K. Saxon ¶¶ 8-11, 13-14, 17-18, Ex. E; Decl. of Z. Klyver ¶¶ 3-7, Ex. F; Decl. of D. Hensley ¶¶ 2-4, 7-9, Ex. G; Decl.

8

of M. Guckian ¶¶ 5-6, Ex. H. Their use and enjoyment of these activities is in large part dependent on healthy marine and coastal environments and robust populations of wildlife that inhabit those waters. *E.g.*, Wiygul Decl. ¶¶ 17-18; Schmahl Decl. ¶ 7; Foster Decl. ¶¶ 22-23. The various impacts of oil and gas development in the Gulf directly impair those interests. *E.g.*, Klyver Decl. ¶¶ 11-12; Hensley Decl. ¶ 9; Steinhaus Decl. ¶¶ 9-11. NMFS's flawed analyses and inadequate mitigation measures in the BiOp and ITS are the legally relevant cause of the Groups' members' injuries. *See 2020 BiOp*, 2024 WL 3860211, at *23. A favorable decision would redress the injuries by requiring NMFS to complete a legally sufficient BiOp. *Id.*

## II. NMFS Failed to Consider the Full Scope of Reasonably Foreseeable Effects to Species.

NMFS arbitrarily disregarded or underestimated four categories of effects: 1) a ≥1 MMbbl oil spill, 2) all other foreseeable spills except a single 100,000 bbl spill, 3) vessel strikes, and 4) G&G survey harm. These errors in the effects analyses caused NMFS to underestimate the degree to which the action may jeopardize the survival and recovery of ESA-listed species.

### A. NMFS Arbitrarily Disregarded the Likelihood and Effects of a ≥1 MMbbl Oil Spill.

The U.S. Gulf is one of the riskiest places in the world for offshore oil drilling. NMFS_516, 61210. Despite the risks, NMFS omitted a catastrophic spill, "defined as a spill over 1 MMbbl," from the action's effects because it "agree[d] with BOEM" that such a spill "is not reasonably foreseeable over the next 45 years." NMFS_528. There are three fatal flaws with NMFS's conclusion. NMFS misinterpreted the 2014 Ji study on which it relied. NMFS arbitrarily disregarded its own contrary factual findings from the 2020 BiOp. And NMFS's conclusion runs counter to its new findings that major spill risk factors are increasing.

#### 1. NMFS Misinterpreted the Ji Study.

NMFS concluded a ≥1 MMbbl spill is not reasonably foreseeable based primarily on its interpretation of a 2014 study by Ji et al. that "predicted the return period for a [≥1 MMbbl spill] as 165 years with a 95% confidence interval between 41 and 500-plus years." NMFS_519; *see* NMFS_528-29. However, NMFS misinterpreted the study's results.

NMFS and the Bureaus misunderstood the Ji study before, in the 2020 BiOp. The Court admitted an expert declaration that explained how the agencies improperly interpreted the study's confidence interval and failed to consider what the estimated return periods meant for the probability of a spill. *Sierra Club v. NMFS*, 711 F. Supp. 3d 522, 540–45 (D. Md. 2024); *see* NMFS_107927-56. While the Court ultimately did not reach these issues, it indicated NMFS should address them on remand. *2020 BiOp*, 2024 WL 3860211, at *12, *40. NMFS did not.

Begin with NMFS's misunderstanding of confidence intervals. NMFS believed a ≥1 MMbbl spill is not reasonably foreseeable because of the "uncertainty" in the Ji study's estimate: "up to [a] 500-year return interval for a 95% [confidence interval]." NMFS_528. There are two problems with that interpretation. First, NMFS ignored that confidence intervals have two sides. Each side is equally likely to encompass the true return period, and the 41-year lower bound of the Ji study's confidence interval is equally likely as its 500-year upper bound. NMFS_2423-28, 107932-33, 108387-89. *Contra* NMFS_511 (also wrongly believing 8- to 91-year confidence interval from Eckle et al. (2012) meant "the return frequency is more likely to be low (i.e., 91 years)"). Second, insofar as NMFS meant that a broader confidence interval means a ≥1 MMbbl spill is less likely, that misapprehends the meaning of a confidence interval. The confidence interval means the true return period likely falls somewhere within the range. NMFS_107932-33, 108387-89. The breadth of the Ji study's confidence interval simply reflects there is great uncertainty about *the study's* precision. NMFS_107940. It does not demonstrate a spill is unlikely. After all, the Ji study's confidence interval meant it could not exclude 41 years (the lower bound) as the true return period for a ≥1 MMbbl spill. NMFS_108387-89.

Next, while NMFS purportedly based its conclusion on the "estimates of the probability of a catastrophic" spill, NMFS never considered the actual *probability* of such a spill. NMFS_528. It considered the return period value—the average number of years between occurrences. However, further math is required to know the probability of the event occurring in a given timeframe. NMFS_107930-38. The Ji study's median 165-year return period for a >1 MMbbl spill equates to a 26.2% probability of such a spill occurring during the 2020 BiOp's 50-

10

year term, NMFS_107939-43, or a 23.9% probability during this BiOp's 45-year term.[1] There is no evidence NMFS "examine[d] the relevant data"—the probabilities over 45 years—before making an effects conclusion based on the probability. *State Farm*, 463 U.S. at 43.

Finally, NMFS failed to account for more recent information indicating the decade-old Ji study likely underestimated future spill risk. *See* NMFS_520 (noting Ji study was based on "pre-2014 data and parameters"). First, the study apparently used a much smaller spill volume (~2 MMbbl) for the *DWH* data point than the currently accepted volume (4.9 MMbbl). NMFS_108392-93. Using the larger volume would have resulted in shorter return period estimates. *Id.* Second, the study was based on spill data only up to 2012. NMFS_519. Since then, the Gulf has experienced a 16,152 bbl spill in 2017 and a 26,190 bbl spill in 2023. NMFS_506-07. In addition, new data show that the 2004 Taylor Energy spill released perhaps well over 100,000 bbl more oil than believed at the time of the Ji study. *See infra* pp. 19-20 (discussing cumulative estimate); NMFS_2240 ("[T]he Taylor spill is not included in catastrophic oil spill statistics."). The addition of three of the largest Outer Continental Shelf (OCS) spills in history to the model could substantially increase estimated spill risk. *See* NMFS_506-07 (tbl. 89), 519 (tbl. 96), 108417 ("[T]he largest spills in the dataset have a significantly greater effect on the statistical catastrophic risk than the smaller spills.").[2] Third, the study was premised on an assumption that future catastrophic spill risk will be no different than historical risk, NMFS_107939, which the BiOp now shows to be false. NMFS and the Bureaus now have more current data: they have the correct *DWH* volume, *see* NMFS_277, they have twelve more years of spill data, *see* NMFS_279 (link to BSEE data), 2346-50, and they have information indicating

---

[1] These values are calculated by changing the $y$ value (years) in the probability equation $(1 - (1-p)^y)$ from 50 to 45, where $p$ = probability in a given year = 1/return period. *See* NMFS_107941.

[2] While a "GOM-focused analysis would not include . . . one of the largest spills to occur on the OCS," NMFS_108126, an analysis using updated Gulf data would add three of the largest spills to occur on the OCS—undermining the agencies' claim (parroted from their briefing in the 2020 BiOp case) that excluding non-Gulf data would "significantly" decrease estimated risk, NMFS_519. That claim remains unsupported and unverified, even after Dr. Lubetkin explained why it is likely inaccurate in the 2020 BiOp case. NMFS_108389-91.

that future spill risk will likely be much greater than historical risk, *see infra* Section II.A.3 (discussing NMFS_499-511). NMFS was required to "at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data." *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 473 (4th Cir. 2013). Instead, NMFS put determinative weight on the decade-old study for its conclusion while disregarding the best available information it has acquired in the decade since. *See Defs.*, 931 F.3d at 346 ("The best-available-data standard also means that [the Service] is not free to disregard other 'available biological information' that 'is in some way better than the evidence [the Service] relies on.'" (citation omitted)). NMFS's exclusion of a ≥1 MMbbl spill from the effects based on its flawed interpretation of the Ji study is arbitrary and contrary to the ESA.

2.    NMFS Arbitrarily Discarded Its Prior Catastrophic Spill Findings.

NMFS previously concluded, in the 2020 BiOp, that an extremely large (≥1 MMbbl) spill *was* reasonably likely to occur over the BiOp's 50-year term. The 2025 BiOp now tries to disclaim those findings. NMFS_529. But "an agency may not simply discard prior factual findings without a reasoned explanation." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015); *see also Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049-51 (9th Cir. 2010). NMFS provided no such reasoned explanation here.

The 2020 BiOp included an extremely large oil spill as an effect of the action for Gulf sturgeon and for critical habitats for the sturgeon and loggerhead sea turtle. NMFS_73405-06, 73415. "In doing so, NMFS necessarily found an extremely large oil spill was reasonably certain to occur." *2020 BiOp*, 2024 WL 3860211, at *11. The 2025 BiOp does not even acknowledge that finding, much less provide any explanation for discarding it.

Separately, in Appendix G of the 2020 BiOp, NMFS determined that one "Deepwater Disastrous Blowout[] resulting in [an] uncontrolled release of oil" was expected "as a Result of the Proposed Action." NMFS_107661. After accounting for what it determined to be the "Best Available Information," including new safety measures, NMFS concluded that "a reasonable estimate of the largest spill size possible" from the proposed action is "1.1 million bbl (Mbbl) in

12

the Gulf of Mexico (between 900,000-1.3 Mbbl)." NMFS_107656-64.

The 2025 BiOp states NMFS is now disregarding Appendix G because it "is inconsistent with the best available science." NMFS_529. *But see* Mem. Supp. Defs.' X-Mot. Summ. J. 11, *2020 BiOp*, No. 20-3060 (D. Md. Feb. 6, 2024) (ECF No. 175-1) ("Appendix G reflects NMFS's efforts to consolidate the best available information on extremely large oil spills from various sources—including BOEM and BSEE—for purposes of its own assessment."). NMFS presented no new inconsistent information or any other reason why what it so recently considered to be the "Best Available Information" is inconsistent with the best science available today. Each reason it gave for its changed position is belied by the record.

First, NMFS faulted Appendix G for not being a "quantitative assessment as provided in the Ji study and other science relied on here." NMFS_529. But Appendix G was specifically based on the same Ji and Eckle quantitative studies as the 2025 BiOp's catastrophic spill conclusion. *Compare* NMFS_107663, *with* NMFS_528; *see also Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1070 (9th Cir. 2021) ("Simply reiterating generic uncertainty that was known at the time of the prior finding does not meet the agency's burden to explain its change in position."). Second, NMFS asserted that Appendix G "based its ultimate conclusion on a single data point, the Deepwater Horizon spill." NMFS_529. But while the *DWH* spill is an important data point (it makes no sense to suggest that the proper way to assess catastrophic spill risk is to ignore catastrophic spill data), Appendix G explained that its conclusion was based, not just on that one data point, but on no fewer than seven "main factors," NMFS_107651, and decades of data, *e.g.*, NMFS_107660-61. Third, NMFS claimed Appendix G is no longer valid "[b]ecause of" regulatory and technical changes since *DWH*. NMFS_529. But Appendix G already accounted for "[r]egulatory reforms and improvements in offshore drilling safety since DWH" and reached its ultimate conclusion "*because of* the safety measures" that had been implemented. NMFS_107651, 107664 (emphasis added). The 2025 BiOp cites no significant new safety measures implemented since 2020.

NMFS's reasons for dismissing Appendix G show that the Appendix actually *is*

consistent with NMFS's current view of the best available science. The 2025 BiOp fails to "offer a 'satisfactory explanation' for its decision in light of the[se] earlier findings." *Humane Soc'y*, 626 F.3d at 1051; *see Vill. of Kake*, 795 F.3d at 968 (finding agency's reversal from finding "high risk" to "'minor' risk" unjustified). Discarding the "evidence that the agency itself has gathered" and analyzed "demonstrate[s] the overall arbitrariness" of NMFS's new conclusion. *Defs.*, 931 F.3d at 351-52.

> 3.    NMFS Ignored Its Findings that Catastrophic Spill Risk Is Increasing.

Even if NMFS had properly interpreted the Ji study and given a rational basis for discarding its prior findings, its catastrophic spill conclusion would still be arbitrary because it failed to consider a critically important aspect of the problem: that numerous factors are significantly increasing future catastrophic spill risk. NMFS instead assumed future spill risk will be no higher than historical risk.

As exploration and production have moved further offshore to deeper waters, so have oil spills. NMFS_499-03. Every 100' of added depth increases the probability of an incident by 8.5%. NMFS_524. And when spills occur in deeper waters, containment is more difficult, and the oil persists in the environment for much longer. NMFS_500-01. The BiOp predicts oil development will continue expanding into deep and ultradeep waters, bringing with it elevated risks. NMFS_277, 518.

Climate change is increasing the intensity of hurricanes, one of the primary causes of oil spills. NMFS_499, 504. "This increase in storm intensity raises the likelihood of storm-related damage to infrastructure and, consequently, spill risk." NMFS_508. Intense hurricanes also trigger submarine landslides, NMFS_509, which damage pipelines and can even topple drilling platforms like in the Taylor spill, NMFS_507-08.

Pipelines become more susceptible to failure and rupture as they age. NMFS_510. More than a third of the Gulf's pipelines are over 30 years old. *Id.* Pipeline breaks in the Gulf caused the two recent >10,000 bbl spills. NMFS_506.

As discussed above, the Ji model assumed that future spill risk will be the same as pre-

2014 risk, so it did not "capture the '*increasing* threat' posed by" these various factors. *See Appalachian Voices*, 25 F.4th at 278. NMFS did not account for these factors, either, when it relied on the Ji study to determine the risk of a catastrophic spill over the next 45 years.

NMFS instead appears to have assumed "safety measures required by the Bureaus post-DWH" will sufficiently reduce future risk. NMFS_528. However, the BiOp acknowledges that, "[d]espite the mechanisms in place, there are still many spills each year in the Gulf of America." NMFS_499. The National Academy of Sciences has recently found numerous inadequacies remain with offshore safety, NMFS_ 61697-18, which become of greater concern as drilling moves to deeper waters, NMFS_524. Even BOEM acknowledged "it is difficult to conclude how effective these [post-*DWH*] measures are at reducing risks." NMFS_2033. Given these question marks, NMFS could not simply toss aside the confluence of factors that significantly increase the future risk of catastrophic spills with "wishful or whimsical thinking" that post-*DWH* measures will be enough to prevent such a spill. *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 533 (D.D.C. 2016) (stating "agency's reasoning is deficient if it is . . . 'based on speculation'" (citation omitted)).

### B.    NMFS Failed to Consider the Effects from Other Reasonably Foreseeable Oil Spills.

In the 2020 BiOp, NMFS failed to "consider the discrete, acute effects of the two very large oil spills it anticipated." *2020 BiOp*, 2024 WL 3860211, at *14. In the 2025 BiOp, NMFS failed to consider the effects of all oil spills *except* the largest one it anticipated.

Here, NMFS determined "at least one spill resulting in a release of up to 100,000 bbl because of a blowout in deep water is reasonably certain to occur over the next 45 years." NMFS_527. So in its "Oil Spill Exposure and Response Analysis," NMFS assessed the "generalized areal coverage for *a* large oil spill (100,000 bbl)." NMFS_532 (emphasis added). Because "100,000 bbl is 2.5% the volume of the *DWH* spill," NMFS multiplied the *DWH* animal exposure estimates by 3% to estimate the number of animals that would be exposed to a 100,000 bbl spill. NMFS_537, 543-44, 547-49. NMFS considered these estimates from the one spill to be

15

the total oil exposures that animals would experience "over the course of the Oil and Gas Program." NMFS_537, 544. It carried these exposure estimates forward to its jeopardy analyses. *See* NMFS_571, 573, 576, 580, 583, 585, 588, 591-92, 594-97.

But NMFS's math and assumptions in calculating the one, blowout-specific spill estimate were wrong. Moreover, NMFS inexplicably excluded effects of other sources and sizes of oil spills that BOEM estimated will result from the program. And even those estimates are too low because they are based on flawed analyses. All told, NMFS vastly underestimated the effects of reasonably foreseeable oil spills on Gulf species and habitats.

        1.      <u>NMFS's Decision to Analyze a Single 100,000 bbl Spill Was Based on a Math Error and Is Otherwise Arbitrary.</u>

NMFS analyzed the likelihood a deepwater blowout because it understood such an event to be the most likely to result in a major oil spill. NMFS_526. NMFS estimated that 63 wells would be drilled annually in waters greater than 800m, for a total of 2,835 wells over the 45-year period covered by the BiOp. *Id*. And it calculated that "the frequency of deepwater blowouts is one blowout for every 275 deepwater wells." *Id.* NMFS then did math: "Using these estimates and, because 63 is 23% of 275, we predict up to two (rounding up) blowouts [((1/275)*2385)*0.23] will occur in water depths greater than 800 m over the next 45 years." *Id.* (brackets in original).

But NMFS's math is wrong. For one, NMFS accidentally transposed digits in the well total to use a value of 2,385 instead of 2,835. The bigger problem, though, is that NMFS wrongly multiplied by the blowout rate twice: once as 1/275 and then again as a component of its 23% multiplier.[3] To calculate the number of blowouts per 45 years, NMFS should have multiplied the

---

[3] To get 23%, NMFS multiplied 63 wells/year by 1 blowout/275 wells: 63/275=0.23. Parsing out 2,835 wells over 45 years to "63 wells/year x 45 years" shows how NMFS's calculation included the blowout rate (in bold) twice:

$$45\ years \times \frac{63\ wells}{1\ year} \times \frac{\mathbf{1\ blowout}}{\mathbf{275\ wells}} \times \left(\frac{63\ wells}{1\ year} \times \frac{\mathbf{1\ blowout}}{\mathbf{275\ wells}}\right) = \frac{2.36\ blowouts^2}{year}$$

Multiplying blowouts per year times blowouts per year times 45 years makes no sense (which is also evidenced by the fact that its result is "blowouts *squared* per year").

total wells (2,835) x 1 blowout/275 wells, which yields a value of 10.3 blowouts—*five times* the number NMFS predicted. Indeed, NMFS used that precise equation in the 2020 BiOp to correctly calculate the number of estimated blowouts (albeit using a much higher deepwater well count of 160 wells/year): $[(1/275)*8000] = 29$. NMFS_107660-61.

NMFS concluded "one of the two deep water blowouts . . . could result in a very large spill." NMFS_527. Applying that same ratio to a corrected blowout estimate of 10.3 yields five expected very large spills. That is consistent with the Ji study's 10-year return level estimate of ~16,000 bbl; which means that one spill of that size is expected on average every 10 years, or five over 50 years. NMFS_520 (fig.103), 47915 (tbl.2), 107943. Indeed, the 2025 BiOp cites the Ji study to support the reasonableness of NMFS's 100,000 bbl *volume* estimate, NMFS_527, but NMFS failed to recognize that its *numerical* estimate of one very large spill runs counter to the Ji study's estimate. NMFS's numerical estimate is also inconsistent with the 2020 BiOp's finding that *two* very large (≥10,000 bbl) spills with a median size of 100,000 bbl are expected. NMFS_73380-81 (tbl.114). NMFS offered no acknowledgment or explanation of these inconsistencies with the record evidence and its own prior findings. *See Defs.*, 931 F.3d at 351-52; *Humane Soc'y*, 626 F.3d at 1050-51.

Even putting aside NMFS's math error, its assumption that the spill will be no larger than 100,000 bbl is contrary to the sources on which it based the volume. NMFS believed the Ji study predicted a 100,000 bbl spill would occur within a 50-year period, NMFS_527, but the study's predicted volume was nearly twice that size: 188,000 bbl. NMFS_108126. NMFS also did not explain why the cited Coast Guard finding that a 100,000-500,000 bbl spill is a "worst credible discharge scenario" supports NMFS's assumption that such a spill will be below that range ("up to 100,000 bbl"). NMFS_527.

Had NMFS not made a math error or misinterpreted the sources on which it relied, it would have had to find that more spills and larger volumes would be spilled into the Gulf as a result of a deepwater blowout over the course of the action. NMFS's failure to evaluate the correct size and number of blowout-related spills caused it to severely underestimate the

17

exposures and effects to species from oil spills. *See 2020 BiOp*, 2024 WL 3860211, at *13 (explaining omission of oil spill effects "could be consequential" to jeopardy determinations).

### 2. NMFS Improperly Excluded All Foreseeable Spills Except One from the Scope of Effects.

Of course, deepwater blowouts are not the only sources of oil spills. Pipelines, vessels, platforms, and shallower-water drilling are also responsible for oil spills as large as tens of thousands of barrels. NMFS_499, 506-07. And a 100,000 bbl spill is not the only oil spill anticipated over the next 45 years. BOEM predicted dozens more spills ≥1,000 bbl are likely to occur. NMFS_513-514, 519. Yet NMFS inexplicably did not include these other spills as effects of the action.

In contrast, in the 2020 BiOp, NMFS included the effects of two very large spills, five large (≥1,000 bbl) spills, and thousands of <1,000 bbl spills that BOEM estimated would occur over 50 years. NMFS_73380-81 (tbl.114). For that BiOp's jeopardy analyses, NMFS assessed the number of animals that would be exposed to those spills. *E.g.*, NMFS_73437, 73442, 73447. *But see 2020 BiOp*, 2024 WL 3860211, at *14 (NMFS "did not consider the discrete, acute effects of the two very large oil spills it anticipated."). That is the correct approach because the ESA requires considering "all consequences" of an action on species. 50 C.F.R. § 402.02. The difference in total estimated oil exposures between the 2020 and 2025 BiOps is remarkable: over 1,075,000 sea turtles, 700 sperm whales, ~4 Rice's whales, and 1,200 Gulf sturgeon in the 2020 BiOp, NMFS_73409 (tbl.119); *but see* NMFS_73437 (estimating 19 Rice's whale exposures), compared to just over 14,400 sea turtles, 8 sperm whales, less than 1 Rice's whale, and 33 Gulf sturgeon in the 2025 BiOp, NMFS_ 548 (tbl.100). The 2025 BiOp provides no explanation whatsoever for why it is reasonable to now assume that nearly ten times fewer animals will be exposed to oil spills than previously estimated. *See Humane Soc'y*, 626 F.3d at 1050-51. NMFS simply did not analyze or include the consequences of all oil spills on species. *See* 50 C.F.R. § 402.02; *2020 BiOp*, 2024 WL 3860211, at *12 ("An expert agency's failure to analyze the impact of an anticipated effect of the proposed action on protected species is a failure to consider

18

an important aspect of the problem.").

   3.  BOEM's Oil Spill Analyses Are Based on Incorrect Assumptions and Flawed Data.

  For its oil spill assessment, NMFS considered "information from [Oil Spill Risk Assessments] and other analyses provided by BOEM." NMFS_526. BOEM's Oil Spill Risk Assessment applied historical spill rates (per billion barrels (Bbbl) of oil produced) to estimates of future oil production to estimate the number of future spills. NMFS_47869-71. There are at least two problems with BOEM's analyses that caused the agency to underestimate risk, thus undermining NMFS's reliance on BOEM's information.

  First, BOEM's analysis was based on outdated spill data that omit multiple recent very large spills. BOEM used historical spill risk data from a 2016 ABS report (NMFS_107561). NMFS_2029, 47869. The ABS report inaccurately assumed the "only major spill in the data since 2010 and the only spill ≥10,000 bbl in over 30 years" was *DWH*. NMFS_107561, at PDF p. 87; *see also* NMFS_520. Part of the issue is that the ABS report predated the 2017 and 2023 ≥10,000 bbl pipeline spills so did not include them. *See* NMFS_506-07. The other problem is that the ABS report did not account for the full volume of the Taylor Energy oil spill. That spill began in 2004 when Hurricane Ivan caused a subsea landslide that toppled Taylor's drilling platform. NMFS_10585. Oil has been gushing from the wells ever since. NMFS_10586. The ABS report counted the volume as "a series of smaller spills" <1,000 bbl. NMFS_107561, at PDF p. 14.[4] More recent monitoring has observed spill rates of 19 to 108 bbl *per day*, which could amount to a cumulative spill volume of well over 100,000 bbl since 2004. NMFS_10589-90; *see* NMFS_519 (acknowledging Taylor spill volume is over 10,000 bbl).

  Using the 2016 ABS report data may have been reasonable for the 2020 BiOp, but it is now five years later. NMFS and the Bureaus reinitiated consultation for the express purpose of

---

[4] Treating the spill in this way, rather than as a single spill, to discount the total volume makes no sense. Like *DWH*, the Taylor spill was triggered by a single catastrophic event that is solely responsible for the full volume of oil released. It would be irrational to consider *DWH* as a series of 93 smaller daily spills, which is effectively how BOEM treats the Taylor spill.

19

conducting a "reevaluation of the oil spill analysis . . . that will consider updated information on oil production, oil transport, and spill rates." NMFS_1609. Rather than account for the updated, available spill data, BOEM (and hence, NMFS) just reused old data. Continuing to rely on the outdated data while "ignor[ing] significant evidence that undermines the reasonableness of [the spill] estimates" is arbitrary and capricious and contrary to the best available science requirement. *Defs.*, 931 F.3d at 351; *see also id.* at 360 ("As a reviewing court, 'we should not silently rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data.'" (citation omitted)).

Second, BOEM's spill risk assessment did not include risk from activities on existing leases, even though the BiOp's scope includes activities "resulting from all prior active leases and future lease sales." NMFS_42. BOEM's spill numbers come from the "Cumulative OCS Program" estimates in a 2023 Ji & Schiff study. NMFS_514-15, 2034-35. Those estimates include only the marginal increase in oil production and spills that would result from ten *new* lease sales, not from the thousands of existing leases as well. This is apparent because BOEM separately estimated that new oil production over 30 years if there are no new lease sales (i.e., from existing leases only) will be 12.31 Bbbl, nearly double Ji & Schiff's production estimate of 7.6 Bbbl over 70 years from the Cumulative OCS Program. *Compare* NMFS_17710-13 (tbl.5-2), *with* NMFS_2229 (tbl.C-3). Accounting for production on existing leases could more than double the number of expected oil spills, since the latter number is derived from production estimates. However, BOEM's estimate of expected spills for the BiOp, which are supposed to reflect activities on all prior and future leases, represents only the spills resulting from activities on future leases. "[I]t is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong." *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 96 (D.D.C. 2017); *see Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015) ("[A]gencies do *not* have free rein to use inaccurate data.").

Had BOEM actually used updated and correct data, its estimated spill numbers for the

20

BiOp's 45-year term would have been much higher. NMFS needed to account for an accurate estimate of anticipated spills when analyzing the effects of the action.

### C.    NMFS Underestimated the Likelihood and Effects of Vessel Strikes.

Vessel strikes pose a well-known and extensively studied risk to large whales in many areas of the globe, including the Gulf. NMFS_359. Oil and gas vessels make up almost half the Gulf's vessel traffic, NMFS_368, and at least one sperm whale has been confirmed to have been struck by an oil and gas vessel. NMFS_182. Countless other strikes likely have gone unnoticed or unreported. NMFS_370-72.

The BiOp correctly recognizes that vessel strikes are a primary threat to the existence of the ~50 remaining Rice's whales. NMFS determined that this harm by itself would jeopardize the survival and recovery of the species. So it proposed an RPA it believed would account for the estimated amount of harm. However, NMFS significantly underestimated the magnitude of likely vessel strikes based on a number of errors and arbitrary assumptions. As detailed in Section IV.A below, this underestimate infects the RPA: without an accurate understanding of the "casualty count" from the action, NMFS could not design an RPA sufficient to counterbalance the harm or conclude that the RPA it proposed will avoid jeopardy. *2020 BiOp*, 2024 WL 3860211, at *31.

Oil and gas vessels also strike and kill a large number of sea turtles each year. The 2020 BiOp placed this number at over 11,500 per year. NMFS_73262 (tbl.56), 73265-66 (tbl.59). The 2025 BiOp cut that estimate by more than 95%, to just over 400. NMFS_393 (tbl.43), 397 (tbl.45). NMFS did not explain or even recognize this disparity resulting from its erroneous 2025 analysis.

To estimate the number of animals of each species that will be killed or injured by vessels over the next 45 years, NMFS used the same fundamental co-occurrence methodology as the 2020 BiOp. *Compare* NMFS_373-74, *with* NMFS_73233. It overlaid vessel traffic data from 2022-2023 on species density data to "[e]stimate[] the relative proportion of vessel strike risk of each species associated with oil and gas vessel traffic." NMFS_373-74. NMFS then determined the historical rate of oil and gas vessel strikes by multiplying the total number of observed vessel strike mortalities by a carcass recovery factor (because relatively few dead marine animals strand or are

21

found before they sink or are scavenged) by the relative strike risk from oil and gas vessels. *Id.* NMFS "assum[ed] these historic estimates are representative of what is likely to occur in the future under the proposed action," and multiplied the historical annual oil and gas vessel strike rates by 45 years to produce the estimated number of strikes resulting in mortality or serious injury and minor or no injury under the program. *Id.* at 374; *see, e.g.*, NMFS_380–81.

There are three major flaws with NMFS's analyses. First, the record shows oil and gas vessel traffic is rapidly increasing, contrary to NMFS's assumption that historical and future traffic will be the same. Second, NMFS arbitrarily discounted its estimate of fatal Rice's whale strikes. Third, NMFS used an inappropriate carcass recovery rate to underestimate sea turtle strike risk.

### 1.    NMFS Wrongly Assumed Oil and Gas Vessel Traffic Will Not Increase.

The amount of vessel traffic is a fundamental input in NMFS's vessel strike analysis. NMFS "assume[d] that the AIS dataset [it] relied on (2022-2023) is reasonably representative of vessel traffic expected over the course of the next 45 years." NMFS_368. The record contradicts this assumption. It demonstrates that oil and gas vessel traffic has nearly doubled over the past seven years and is likely to continue increasing. NMFS's contrary assumption caused it to arbitrarily underestimate future strike risk to whales and sea turtles.

In 2018 (the last year of data in the 2020 BiOp), oil and gas vessels traveled just over 10,000,000 kilometers annually. NMFS_73225. By 2023 (the last year of data in the 2025 BiOp), that number had more than doubled to nearly 23,000,000 kilometers annually. NMFS_368. The distance traveled is the key variable used to calculate the proportion of oil and gas vessel traffic relative to other vessels and of vessel strike risk attributable to oil and gas vessels. *See* NMFS_373-74. Put simply, as oil and gas vessel traffic increases, so does the risk of a fatal strike. By wrongly assuming that this variable will remain constant and not increase, NMFS underestimated the 45-year vessel strike risk. NMFS "had a duty here to examine and justify the 'key assumptions' underlying its decision, and it failed to do so." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (citation omitted); *see also Dow AgroSciences*, 707 F.3d at 472 (requiring NMFS to "explain[] how the assumption matches up with real-world conditions").

22

2.      NMFS Arbitrarily Discounted the Number of Fatal Rice's Whale Strikes.

In the 2020 BiOp, NMFS concluded oil and gas vessel strikes would kill 12 Rice's whales over 50 years. NMFS_73248. In the 2025 BiOp, NMFS concluded the death toll would be half that over 45 years. NMFS_382-83. What changed? While there was some difference in the vessel traffic data, the primary reason is NMFS discounted the mortality number at the last minute in response to comments from Intervenors. NMFS's basis for doing so is arbitrary and contrary to the best available science.

Applying the co-occurrence methodology described above, NMFS estimated that oil and gas vessels would strike and kill 11 and injure 5 Rice's whales over the 45-year period for the action, similar to its 2020 BiOp 50-year estimates. NMFS_380-81. In response to comments from Intervenors on the draft 2025 BiOp, *see* NMFS_2472-73,[5] NMFS took an additional step and averaged its modeled estimate with two "preliminary" and unvalidated outputs from a new model to conclude that only 6 Rice's whales will be fatally struck over 45 years. NMFS_381-83.

This new model, described in a 2025 paper by Blondin et al. (NMFS_7272-87), attempts to incorporate potential behavioral responses by whales to oncoming vessels. NMFS_381. The model still has "several significant sources of uncertainty" and depends on making a number of assumptions. NMFS_7283-84. The record does not show what assumptions or inputs NMFS used when it ran the model. *See Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 864 F.3d 738, 746 (D.C. Cir. 2017) ("[W]hen the data relied on by an agency in reaching its decision is not included in the administrative record . . . we cannot determine whether the final agency decision reflects the rational outcome of the agency's consideration of all relevant factors." (cleaned up)). NMFS repeatedly stressed that its new analysis was only "preliminary." NMFS_381-82. And it cautioned that there was "no way to validate the absolute [mortality] estimates produced by the model," so only "relative risk" could be considered. NMFS_382. Nonetheless, NMFS used the model to

---

[5] *See also* Letter from K. Damon-Randall, NMFS, to A. Kaller, BOEM, & T.J. Brousard, BSEE (Sept. 2, 2025) (BiOp Errata noting "addition of the Blondin methodology was in part a response to applicant comments on the draft"), https://www.fisheries.noaa.gov/s3/2025-09/Errata-Letter_9.2.2025.pdf.

produce mortality estimates of 1 fatal vessel strike over 45 years if Rice's whales always try to avoid vessels and 5 fatal strikes if they never do. NMFS_381.

Despite all the caveats and uncertainty around those preliminary outputs, NMFS averaged them with the 11-strike estimate from its established co-occurrence model to produce a final estimate of 6 fatal strikes ((11+1+5)/3). NMFS_382-83. NMFS claimed it did this to "supplement" its analysis "given Rice's whale's small population size and vulnerability." NMFS_381. NMFS did not explain how averaging, and consequently halving, the mortality estimate with an untested application of a novel approach responds to or otherwise helps in any way with the Rice's whale's vulnerability. More significantly, NMFS did not and could not explain why it gave the two highly caveated Blondin model outputs *double* the weight (much less any weight at all) as the output from its established model in its averaging. *See Defs.*, 931 F.3d at 349-352 (finding BiOp arbitrary when agency relied on unreliable estimate instead of "evidence that the agency itself has gathered"). NMFS cannot justify its heavy reliance on the Blondin model to discount the estimated magnitude of the harm posed by vessel strikes and, accordingly, the degree of harm the RPA must address.

### 3.    NMFS Underestimated Vessel Strikes to Sea Turtles.

NMFS did not explain why the 2025 BiOp's sea turtle vessel strike estimates are just a fraction of those in the 2020 BiOp. *Compare* NMFS_73270 (tbl.60), *with* NMFS_400 (tbl.46); *see Humane Soc'y*, 626 F.3d at 1050-51. The 2025 BiOp, however, provides one clue of where the agency's analysis went awry. NMFS applied the same 16% carcass recovery rate for all sea turtles. NMFS_393. That rate was derived from studies of recovery rates for turtles killed within a few miles of shore. NMFS_396; *see* NMFS_25403, 34887. However, "carcasses are only likely to strand if mortality occurs within 20 km or less from shore." NMFS_25401. That means sea turtles struck by vessels farther from shore have close to a 0% recovery rate and would not have shown up in historical stranding data. While multiplying historical strandings by a 16% recovery rate may have been an appropriate approach to estimate strikes of most larger sea turtles, which tend to stay closer to the coast, it is inappropriate to estimate fatal strikes of the smaller sea turtles generally found in waters farther offshore. *See* NMFS_313-16. In the 2020 BiOp, NMFS did not use such a

24

carcass recovery rate for small sea turtles and, as a result, estimated that 10,589 small turtles would be killed and another 9,427 injured per year as a result of vessel strikes. NMFS_73263. The 2025 BiOp estimates only 31 small turtles will be struck per year. NMFS_397 (tbl.45). NMFS's new estimates are arbitrary and capricious and contrary to the best available science.

**D.      NMFS Arbitrarily Dismissed Harms from G&G Surveys.**

Just as animals use eyesight on land, Rice's whales depend on sound to communicate, navigate, avoid predators, locate prey, and raise their young. NMFS_404. Unfortunately, G&G surveys "inundate[] the soundscape with near-continuous elevated noise levels," interfering with every one of these functions. NMFS_109003; *see also* NMFS_82469, 103048. Airguns fire every 10-16 seconds, day and night, for days, weeks, and sometimes months, as ships drag airgun arrays across large swaths of the Gulf to survey for oil and gas deposits. NMFS_10513, 82400. The booms are capable of deafening whales at close ranges and can be heard from hundreds of miles away. NMFS_82469, 82493. In short, noise from these powerful surveys "dominate[s] the northern Gulf of Mexico ambient noise environment." NMFS_109003; *see also* NMFS_82469, 103048. Despite the pervasive nature of this threat, the BiOp fails to fully account for the harm G&G surveys will cause to Rice's whales.

NMFS used a model to estimate that G&G surveys will expose Rice's whales to noise levels that can cause permanent hearing loss (known as "permanent threshold shift" (PTS)) 12 times a year and to levels that cause temporary hearing loss (known as "temporary threshold shift" (TTS)) and behavioral harassment 452 times a year. NMFS_425. The foundational problem is NMFS's model used outdated Rice's whale density data from 2016 that caused it to underestimate exposures. *Id.* NMFS now has newer data, presented in a series of 2022-2023 publications, that the agency has deemed "the best available density estimates for listed cetaceans," including Rice's whales. NMFS_311. The new data show much higher densities of Rice's whales—33-38% of the population, depending on season[6]—in the central and western

---

[6] These particular numbers are in Table C.2-16 (cited on NMFS_82628) of the Gulf of Mexico Marine Assessment Program for Protected Species: Volume 1 Report. The appendix pages were

Gulf than the old data. *Compare* NMFS_186-87 (figs.23 & 24), *with* NMFS_73051 (fig.23). But NMFS did not update the G&G exposure model to incorporate this new information. Accordingly, it failed to accurately account for how many times Rice's whales will be exposed to harmful G&G sound levels in the western and central Gulf, where survey effort is intensive. *See* NMFS_439-40. The BiOp does not explain why NMFS continued "to rely on the older data" that, by the agency's admission, are no longer the best available science. *Dow AgroSciences*, 707 F.3d at 473.

Compounding the problem, NMFS dismissed all harm from the exposures that it *did* estimate. For PTS exposures, NMFS arbitrarily assumed that Rice's whales would avoid exposure to those harmful sound levels about 80% of the time, based on a study of a different whale species (bowhead whales) during a behavior (migration) that Rice's whales do not share. NMFS_428; *see* NMFS_38838 ("Unlike most other mysticete whales, the Bryde's-like whales [e.g., Rice's whales] do not undertake large-scale seasonal migrations."). NMFS accordingly discounted the model's estimate of 12 PTS exposures per year to just over 2, for up to 108 PTS exposures over the 45 years of the action. NMFS_428. NMFS did not "justify the 'key assumption'" that Rice's whales will exhibit the same avoidance behavior as migrating bowhead whales. *U.S. Sugar*, 830 F.3d at 650. The bigger problem, however, is that NMFS failed to analyze whether the remaining 108 exposures—which result in permanent hearing damage to some of the few remaining individuals of a hearing-dependent species—would cause or contribute to jeopardy. It simply dismissed the exposures altogether for jeopardy purposes. NMFS_569-70; *see 2020 BiOp*, 2024 WL 3860211, at *12 ("If [something] is an effect of the action, then NMFS needed to consider its effects" on the species.).

NMFS similarly dismissed the harm from over 450 annual TTS and harassment exposures as inconsequential. NMFS_570. NMFS reasoned that, "[a]s a capital breeder" (a type

---

missing from the version of this report included in the initial administrative record provided to Conservation Groups, but they are available at: https://seamap.env.duke.edu/seamap-models-files/SEFSC/Reports/20220803_Volume2_AppendixC_MM_SpatialDensityModels.pdf.

of whale that "rel[ies] on energy that has already been stored"), Rice's whales may be less sensitive to interruptions in feeding caused by TTS or harassment. *Id.* The problem is Rice's whales are *not* capital breeders: "In contrast, Bryde's-like whales are best characterized as 'income breeders' that rely upon consistent prey resources throughout the year to support the energetic costs of reproduction." NMFS_38838. Therefore, "it is essential that habitats that support these species have consistent, predictable, and high-energy prey resources to maintain survival and calf production." *Id.* In short, Rice's whales cannot just go elsewhere and rely on stored energy when their feeding and day-to-day behaviors are disturbed, as NMFS assumed. "Suffice it to say, it is arbitrary and capricious for [NMFS] to base its decision" to dismiss 20,000 predicted TTS and harassment exposures over 45-years as inconsequential "on a factual premise that the record plainly showed to be wrong." *Rauch*, 244 F. Supp. 3d at 96.[7]

Finally—and independently from its arbitrary treatment of modeled PTS and TTS exposures—NMFS failed to include recognized effects of chronic G&G noise in its jeopardy analysis. *See* NMFS_570. As discussed, the "ambient soundscape" of the Gulf is flooded with near-constant and far-reaching noise from G&G surveys. NMFS_267 (finding "the same surveys detected simultaneously at distant sites throughout the Gulf"). The BiOp recognizes that "*[i]n addition to* having acute effects due to the immediate exposure of loud sounds from seismic activity," the "fairly constant[]" noise from G&G surveys causes "chronic stress and masking of important biological sounds" that the whales use to communicate and find prey. NMFS_439-40 (emphasis added); *see* NMFS_108837 (citing studies in the record on impacts of masking). It concludes, "Such chronic exposure is expected to negatively affect the fitness of individual Rice's whales." NMFS_440. But even though "[a]ny effects that may reduce the fitness of

---

[7] In discounting both PTS and TTS effects, NMFS also relied to an unspecified extent on the lack of G&G surveys within the "Rice's Whale Area" in the eastern Gulf. NMFS_570. The problem, however, is that Rice's whales in the western and central Gulf will suffer PTS and TTS exposure from the intensive G&G surveys in that region. NMFS may not simply assume away that harm on the basis that additional PTS and TTS harm does not also occur in the eastern Gulf. *Cf.* NMFS_429 (admitting whales "outside or near the edge of the [eastern Gulf] moratorium area could be exposed multiple times in a year").

individuals . . . will affect the population," NMFS_571, NMFS inexplicably omitted the biologically significant effects from chronic G&G noise exposure from its jeopardy analysis. *See* NMFS_569-72. In doing so, it failed to assess "the magnitude of the stressors' impact, the populations' ability to tolerate this impact, and the reason why any decline will not reduce the overall likelihood of survival or recovery." *S. Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247, 1267 (E.D. Cal. 2010).

NMFS's attempts to discount and dismiss the harm from G&G surveys runs counter to the record and violates its duties to use the best available science and rationally explain its decisions. As a result, NMFS significantly underestimated the extent to which G&G surveys may cause or contribute to jeopardy of the Rice's whale.

### III.    NMFS's Jeopardy Conclusions Are Arbitrary and Contrary to Law.

Because NMFS failed to properly evaluate the action's effects, its conclusions about whether those effects jeopardize the survival or recovery of species are "are necessarily arbitrary." *Appalachian Voices*, 25 F.4th at 278. NMFS made additional errors at the jeopardy step, too: it arbitrarily dismissed its prior findings about the degree to which combined effects from the action jeopardize Rice's whales, it failed to account for climate impacts in the environmental baselines used, and it reached irrational conclusions about jeopardy to recovery.

#### A.    NMFS Arbitrarily Dismissed the Combined Effect of Multiple Stressors on the Rice's Whale Population.

In the 2020 BiOp, NMFS determined that the "wide-ranging, combined multiple effects" from five "combined stressors" jeopardize the Rice's whale: vessel strikes, vessel noise, marine debris, oil spills and dispersants, and seismic survey noise. NMFS_73435-39. In the 2025 BiOp, NMFS discarded that finding and concluded that only vessel strikes are likely to cause jeopardy. NMFS_571-72. NMFS failed to rationally justify dismissing the other contributors to jeopardy.

NMFS explained in the 2020 BiOp that, "[g]iven [the species'] precarious status, any effects that are expected to reduce the fitness of individuals or result in mortality are of great concern." NMFS_ 73438; *accord* NMFS_571 (2025 BiOp). In addition to finding harm from

28

vessel strikes, oil spills, and marine debris, NMFS determined that G&G survey noise and chronic vessel noise alone would "negatively affect the fitness" and "reproduction" of whales. NMFS_73437. It concluded that, due to "the combined effects of exposure to the stressors[,] . . . *all* individual [Rice's] whales *not killed* by vessel strikes" would suffer a reduction in fitness via effects to their "reproduction and/or survival." NMFS_73438 (emphases added). That is, even if no vessel strikes occurred, the entire population would still suffer harmful fitness consequences from the remaining stressors. NMFS concluded the "combined" harm from exposure to multiple stressors would cause jeopardy. NMFS_73439. Although NMFS asserted that an RPA focused on vessel impacts would prevent jeopardy, this Court held NMFS failed to explain how the remaining stressors, individually or in combination, would not cause jeopardy. *2020 BiOp*, 2024 WL 3860211, at \*28-29.

Rather than mitigating those other stressors in the 2025 BiOp, NMFS chose to simply claim they no longer contribute to jeopardy. It did so by making individual jeopardy determinations for each stressor in isolation, rather than in combination as it did in the 2020 BiOp. *See* NMFS_570-71. That makes no sense, legally or biologically.

Legally, the ESA requires NMFS to determine whether the "action" as a whole will cause jeopardy. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(c)(4), (g)(4). To be sure, that requires evaluating each type of effect caused by the action, but it also requires adding all those "effects of the action" together to determine if they will cause jeopardy. *See* 50 C.F.R. § 402.02 (defining "effects of the action" as "all consequences"); U.S. Fish & Wildlife Serv., *Endangered Species Consultation Handbook* 4-37 ("The [jeopardy] analysis then looks at whether, given the *aggregate* effects, the species can be expected to both survive and recover." (emphasis added)). NMFS may not segment the stressors and analyze jeopardy from each in isolation. That could allow NMFS to find that no individual stressor causes jeopardy, resulting in a no-jeopardy BiOp, when the combined effects of all the stressors *would* cause jeopardy. *See Appalachian Voices*, 25 F.4th at 269 (quoting *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 929-30 (9th Cir. 2008)); *cf. Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003) (explaining

29

ESA prohibits dividing an "agency action" into "multiple small actions, none of which, in and of themselves, would cause jeopardy . . . without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species"); *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1148 (W.D. Wash. 2000) ("[A] comprehensive biological opinion addressing the full scope of the [action] should, at the very least, identify all the relevant management measures and explain how these measures individually, *and in combination*, affect the listed species and its marine environment." (emphasis added)). But that is exactly how NMFS concluded there will be no jeopardy after implementing the RPA in this BiOp. *See infra* Section IV.A.

Biologically, exposure to "combined multiple effects" can cause greater adverse fitness effects than exposure to just one stressor. NMFS_73439. This can happen on the individual whale level, where harm from one stressor may be minor, but cumulative harms affect survival and reproduction. *See, e.g.*, *id.* ("In isolation (i.e., considering no other stressors), only minor effects from oil spill and dispersant exposure are expected, but given the multitude of stressors oil exposed individuals are expected to experience, it is possible that exposure to oil spills and dispersants may further impact individual whale fitness."). And it can happen on the population level, where harm to a small portion of whales may not cause a decline, but harm to all whales from a combination of stressors will. *See, e.g.*, *id.* (stating "the entire small, isolated [*sic*] of [Rice's] whales is expected to experience a reduction in fitness from combined stressors"). NMFS may not now "disregard[] the reality that small, non-threatening injuries can incrementally lead to a fatal result, whether it is the 'straw that broke the camel's back' or 'death by a thousand cuts.'" *Ctr. For Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 795 F. Supp. 2d 1199, 1207 (D. Colo. 2011). The only biologically and legally sound way for NMFS to assess jeopardy is to consider the combined effects of all stressors.

NMFS's individual determinations for each stressor (other than vessel strikes) also conflict with its findings in the 2020 BiOp. For example, the 2025 BiOp states NMFS does "not expect exposure to vessel noise associated with the Oil and Gas Program to result in a reduction in numbers or reproduction of Rice's whale," NMFS_570, after previously finding vessel noise

30

would "result in chronic stress of individuals" that "could have negative effects on reproduction," NMFS_73437. "NMFS cannot avoid its duty to confront these inconsistencies by blinding itself to them." *Humane Soc'y*, 626 F.3d at 1051.

The extent of exposure to all these stressors has not changed significantly in this BiOp. NMFS has provided no rational basis for why they no longer contribute to jeopardy.

### B.     NMFS's Jeopardy Analyses Fail to Account for Climate Impacts to the Environmental Baseline.

The ESA requires NMFS to analyze the effects of the action on species in the context of climate change when assessing jeopardy. *Appalachian Voices*, 25 F.4th at 276-78. The BiOp describes numerous "changing environmental conditions" and concludes they "are likely to change the status of the species and the condition of their habitats." NMFS_262-65. But NMFS then left those changes out of the baseline it used for its jeopardy analysis for each species. Such a failure to consider climate effects "in connection with its analysis of the effects" of the proposed action renders the BiOp "arbitrary and capricious." *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1234 (E.D. Wash. 2016), *cited by Appalachian Voices*, 25 F.4th at 276.

NMFS must "determine[] whether 'jeopardy might result from the agency's proposed actions in the present and future human and natural contexts'—not 'in a vacuum.'" *2020 BiOp*, 2024 WL 3860211, at *14 (quoting *Appalachian Voices*, 25 F.4th at 270). "It is clear . . . that climate change typically must form part of the analysis in some way." *Appalachian Voices*, 25 F.4th at 271 (citing *S. Yuba River*, 723 F. Supp. 2d at 1274 (reviewing cases)). "However, an agency cannot simply summarize the effects of climate change and then analyze the proposed action under the assumption that climate change will have no effect." *Ctr. for Biological Diversity v. Bernhardt*, 595 F. Supp. 3d 890, 915 (D. Ariz. 2022), *rev'd on other grounds sub nom Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980 (9th Cir. 2023); *see also Nat'l Wildlife Fed'n v. NMFS*, 184 F. Supp. 3d 861, 917-22 (D. Or. 2016) (rejecting BiOp where NMFS "merely recited or ignored all the new information [on climate change] and did not apply any of it" in jeopardy analysis). Rather, NMFS must *incorporate* those effects into its jeopardy

31

analysis and explain "how it reached its no-jeopardy conclusion in light of these significant effects from climate change." *Oceana, Inc. v. Ross*, No. 15-0555, 2020 WL 5995125, at *15-16 (D.D.C. Oct. 9, 2020); *see also Willamette Riverkeeper v. NMFS*, 763 F. Supp. 3d 1203, 1237-38 (D. Or. 2025); *Irving*, 221 F. Supp. 3d at 1233-34. NMFS did not do so here.

The BiOp and record evidence establish that climate change is already causing a range of consequences to species and their habitats that will only get worse in the future. NMFS_265. The BiOp specifically cites climate change—or "changing environmental conditions" in NMFS's parlance—as a threat to sperm whales, NMFS_182, sea turtles, NMFS_197, and Gulf sturgeon, NMFS_246. Wildlife in the Gulf are particularly susceptible, where waters are warming twice as fast as the global ocean. NMFS_262-63. Sea turtle populations may become less stable, in part because rising seas are eliminating beach nesting habitat and warmer nest temperatures will skew sex ratios of hatchlings female. NMFS_265; *see also, e.g.*, NMFS_43285-99, 107590, at PDF pp. 41-44. Marine mammals are also highly vulnerable because they "rely on stable environments where prey availability is relatively predictable," and climate change is upending prey availability. NMFS_264. The Rice's whale is "among the most vulnerable to climate change." NMFS_53748. "Marine mammal species with restricted geographical distributions and habitat tolerances" (i.e., the Rice's whale) "will have limited opportunities to adapt to the changing conditions of their environment." NMFS_264; *see also, e.g.*, NMFS_38850. The recognized climate-induced changes represent the "future human and natural context[]" in which NMFS needed to evaluate jeopardy. *Appalachian Voices*, 25 F.4th at 269 (citation omitted).

The introduction to the jeopardy section vaguely asserts that NMFS "considered" climate change information and "incorporated" climate impacts into is jeopardy analyses. NMFS_569. It claims NMFS did "not discern any instance" in which the potential impacts of climate change "alter[ed] [its] ultimate conclusions on jeopardy." *Id.* That conclusory paragraph is the extent of NMFS's "assessment" of how climate change may affect jeopardy for each and every species.

NMFS may not rely on such "conclusory assurance[s]" for its jeopardy conclusions. *2020 BiOp*, 2024 WL 3860211, at *28. And merely "[s]tating that [climate change] was considered . . .

32

is not a substitute for considering" it. *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (citation omitted). The record contains no evidence showing that NMFS actually incorporated a changing future environmental baseline into its jeopardy analyses or "assess[ed] whether [the species] can sustain impacts from the [action] on top of climate change effects." *Willamette Riverkeeper*, 763 F. Supp. 3d at 1237-38. Rather, for each species, NMFS considered the *current* status and distribution of the population. NMFS_569, 572, 574-75, 578, 581, 584-86, 588. It then added the estimated effects of the action to that current status—not the future context—to reach its jeopardy conclusion. The evidence shows climate change will alter the context in which these species experience effects from the oil and gas program over the next 45 years. The jeopardy analyses instead "assumed constant environmental conditions," "fail[ing] to account for the one thing we know about climate change: that it will get worse over time." *Appalachian Voices*, 25 F.4th at 277 (citation omitted).

The jeopardy analyses needed to account for how species will encounter changing conditions "in some way." *Id.* at 271. NMFS's failure to do so is arbitrary and capricious.

### C.    NMFS's Assertions that the Action Will Not Jeopardize the Recovery of Species Are Illogical and Counter to the Record.

The ESA requires NMFS to evaluate the action's impact to not only the survival of a species, but also its recovery. *Defs.*, 931 F.3d at 355. While the 2020 BiOp ignored recovery altogether, the 2025 BiOp includes conclusions that the action will not jeopardize species' recovery. The problem is there is no rational connection between these conclusions and the facts.

Survival and recovery are "distinct" concepts that "must each be evaluated" in reaching jeopardy determinations. *Id.* at 357-58. "Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate" under the ESA's criteria. 50 C.F.R. § 402.02. The recovery determination is important because "even before a population is extinguished, it may reach a point at which it is no longer recoverable: 'a species can often cling to survival even when recovery is far out of reach.'" *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010) (citation omitted). It is not enough for NMFS to simply assert there will

33

be no jeopardy to recovery; it must "articulate a rational connection between its findings and its ultimate conclusion" that the action will not jeopardize recovery. *Id.* at 528; *see, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 999 (D. Ariz. 2011) ("Although the BiOp concludes that the proposed action 'will not affect' [recovery], a full *analysis* of the effect of the proposed action on recovery is absent." (citation omitted)).

For each species, the BiOp describes recovery criteria from the species' recovery plans that specifically require *reducing* various impacts from oil and gas development. It then illogically concludes the action will not impede those recovery objectives, even though it will maintain oil and gas impacts at the same or higher levels for the foreseeable future. NMFS_574 (sperm whales), 577 (green sea turtles), 581 (loggerhead sea turtles), 584 (Kemp's ridley sea turtles), 585 (hawksbill sea turtles), 587 (leatherback sea turtles). *See generally* NMFS_310-567.

For example, NMFS noted the "major population limiting factors" identified in the Kemp's ridley sea turtle's recovery plan include "vessel strikes; oil, gas, and liquid natural gas exploration, development, and removal; marine debris ingestion and entanglement; oil, fuel, tar, and chemical pollution; [and] low frequency noise pollution." NMFS_584; *see* NMFS_67716-17. NMFS acknowledged the program will cause "mortality, injury and behavioral harassment" from those impacts. NMFS_584. But then it simply "anticipate[d]" that those impacts would not impede recovery. *Id.*

Similarly, the BiOp acknowledges "[t]he Rice's Whale Recovery Outline identifies the primary threats to Rice's whale as energy exploration and development, exposure to oil spills and spill response, vessel collisions, anthropogenic noise during seismic surveys" and "noise from shipping traffic and other vessels, and unpredictable and catastrophic events." NMFS_571 (hyperlink omitted). It finds that the action is wholly or significantly responsible for every one of those threats, too. Yet NMFS again illogically asserted that effects other than vessel strikes "are not likely to appreciably reduce" the Rice's whale's recovery. NMFS_572. In addition, NMFS did not evaluate whether continuing to authorize new oil and gas development in the western and central Gulf may inhibit the Rice's whale "range expansion," which is important "for the

34

population to grow" (i.e., recover). NMFS_89840; *see* NMFS_108859 ("Continued activities and associated noise within the north-central and southern Gulf of Mexico may keep the species limited to" the northeastern Gulf.). NMFS's Rice's whale recovery conclusion not only is unlawful, but it prevented the agency from shaping an RPA sufficient to avoid jeopardy to recovery *as well as* survival. *See infra* Section IV.

NMFS may not just assume away the precise impacts that recovery plans identify as impediments to recovery. In doing so, NMFS failed to make a rational connection between its recovery conclusions and the facts. *See Defs.*, 931 F.3d at 355; *Wild Fish*, 628 F.3d at 528-29.

## IV. The Reasonable and Prudent Alternative Fails to Ensure that the Action Will Not Jeopardize the Rice's Whale and Violates the ESA.

Because NMFS concluded only vessel strikes are likely to jeopardize the Rice's whale, it proposed an RPA aimed narrowly at that stressor and asserted that would avoid jeopardy. NMFS_605-06. However, as this Court succinctly summarized, "[i]t is not enough for the RPA to include a 'conclusory' assurance"; NMFS must "'analyze *how*' the proposed alternative 'will avoid jeopardy.'" *2020 BiOp*, 2024 WL 3860211, at *28 (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1092-93 (9th Cir. 2005)). NMFS must demonstrate that the RPA provides "sufficient protection against jeopardy." *Bureau of Reclamation*, 426 F.3d at 1091; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 636 (9th Cir. 2014). And it must rationally "explain why" the level of harm remaining after RPA implementation "does not endanger" the species' survival or recovery. *Defs.*, 931 F.3d at 352.

NMFS failed to meet these standards in two independently fatal respects. First, its no-jeopardy conclusion fails to account for the full magnitude of harm remaining after RPA implementation because NMFS made multiple errors that caused it to underestimate that harm. Second, NMFS failed to demonstrate the RPA will do *anything* to reduce the number of vessel strikes to Rice's whales, let alone to the degree necessary to prevent jeopardy.

35

A.      **NMFS's RPA Conclusion Fails to Account for the Full Scope of Harm.**

As explained above, NMFS began its RPA analysis with a significant underestimate of the magnitude of harm for which the RPA must compensate to avoid jeopardy. Because "[a]ny effects that may reduce the fitness of individuals or result in mortality [or Rice's whales] will affect the population," NMFS_571, NMFS's no-jeopardy finding for the RPA is arbitrary if it did not account for all those effects, *see 2020 BiOp*, 2024 WL 3860211, at \*28 ("The RPA's unexplained failure to account for multiple effects of the action . . . individually and in combination, renders the RPA invalid.").

NMFS arbitrarily and unlawfully concluded the action will result in just six fatal vessel strikes, when its own modeling and other critical factors it ignored showed a much higher risk. *See supra* Section II.C. So even if NMFS had rationally explained how the RPA sufficiently addresses the risk of six fatal vessel strikes, the agency did not and could not demonstrate that the RPA would be sufficient to avoid jeopardy from a higher number of fatal strikes. NMFS also underestimated harm from the other stressors remaining after the RPA's implementation, underestimating oil spill and G&G survey effects, *see supra* Sections II.A, B, D, and failing to consider the multiplicative or cumulative risk created by exposure to multiple stressors, *see supra* Section III.A. Finally, NMFS set the no-jeopardy bar too low by failing to account for climate-related shifts in the environmental baseline or properly account for the Rice's whale's recovery needs. *See supra* Sections III.B, C; *Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013) (explaining NMFS "had to consider" recovery when assessing RPA).

Because NMFS weighed the RPA against an erroneous account that underestimates the harm that must be mitigated to avoid jeopardy, it failed to show the RPA provides "*sufficient* protection against jeopardy." *Bureau of Reclamation*, 426 F.3d at 1092 (emphasis added). NMFS cannot "simply assert that its decisions were protective and so withstand all scrutiny." *Id.*

B.      **NMFS Failed to Demonstrate the RPA is Sufficient to Avoid Jeopardy from Even the Unreasonably Small Number of Vessel Strikes NMFS Estimated.**

The Rice's whale population is so precarious that the loss of "even a single reproductive female could lead this species to extinction" NMFS_109315; *see* NMFS_571. It is vital that

36

NMFS's RPA sufficiently address the imminent risk of vessel strike mortality. Yet NMFS did not show that "the RPA measures would reduce the number of vessel strikes enough to prevent the proposed action from jeopardizing the survival and recovery of the Rice's whale." *2020 BiOp*, 2024 WL 3860211, at *31.

An RPA's measures must be "reasonably specific, certain to occur, and capable of implementation . . . and most important, they must address the threats to the species in a way that satisfies the jeopardy . . . standard[]." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987)). However, the RPA consists of little more than an aspiration and a hope that technology will become available. *See* NMFS_601-05. The core element is the future development and deployment of a "tech plan" that could identify real-time whale locations and prevent vessel strikes. NMFS_602-04. *But see* NMFS_86998-99 (recommending against using "early warning systems . . . to mitigate vessel collisions" in part because "[t]here is no evidence" they "reduce[] the number of collisions"). Nothing about this measure is specific, much less demonstrated to be capable of certain implementation. In fact, the RPA expressly states it "does not require the development of technology by the agencies" merely "the employment of technology as it becomes available." NMFS_606. This is a prayer, not a plan. NMFS cannot "refer only to generalized contingencies or gesture at hopeful plans" in reaching a "no jeopardy" conclusion. *Ctr. for Biological Diversity v. Bernhardt* (*Bernhardt 2020*), 982 F.3d 723, 743 (9th Cir. 2020); *see also Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1128 (D. Or. 2011) (explaining NMFS may not "simply promise to figure it all out in the future").

Most of the remaining elements contemplate additional studies, monitoring, and working groups, none of which "address the threats" in a concrete way. *Rumsfeld*, 198 F. Supp. 2d at 1152. The only immediate action would require the Bureaus to "identify" and vessel operators to use a "near real-time platform" like WhaleAlert to track available information on Rice's whale detections. NMFS_601. NMFS recommended the same action in the 2020 BiOp. NMFS_73501. It has provided no information demonstrating such a platform has been or would be effective at

37

reducing risks. *See* NMFS_86999 (stating "it is unknown whether 'Whale Alert' [has] helped to reduce collision risks" to other whales).

Even assuming these elements were reasonably certain to be implemented, the critical feature they lack is any requirement to take action to reduce the likelihood of hitting a whale. The 2020 BiOp, for all its shortfalls, at least required action—reducing speed and avoiding nighttime transits in an area of Rice's whale habitat in the eastern Gulf. NMFS_73483. Its measures meaningfully addressed factors like vessel speed—a critical variable in whether a vessel is likely to kill a whale—in the limited areas where they apply. *See* NMFS_373, 607. The 2025 RPA requires no similarly effective mitigating actions.[8] Simply put, the RPA's concept of a plan does not meet the ESA's requirements.

Ultimately, NMFS says "nothing at all, quantitative or qualitative, about how [many] of the harmful vessel [strikes] the proposed measures would eliminate." *2020 BiOp*, 2024 WL 3860211, at *29. Nearly identically to the 2020 BiOp, it simply asserts the RPA would "reduce[] or avoid[] the risk of injurious and lethal vessel interaction" so would reduce strike risk enough to be "discountable." NMFS_606-07, 608; *cf. 2020 BiOp*, 2024 WL 3860211, at *28 ("The RPA's 'analysis' was nothing more than two sparse sentences about what the proposed measures aspired to do ('avoid or reduce mortalities and serious injuries from oil and gas related vessel strikes' and 'reduc[e] vessel noise') and a conclusory assurance that NMFS believed the measures would prevent jeopardy." (alteration in original)). Such "a conclusory assurance . . . 'alone is insufficient to sustain the BiOp and the RPA.'" *2020 BiOp*, 2024 WL 3860211, at *28 (quoting *Bureau of Reclamation*, 426 F.3d at 1092). Without any analysis of the efficacy of the RPA's measures or a gauge to know what level of residual strike risk will not cause jeopardy, it

---

[8] The RPA's reference to a "vessel strike protocol," the core components of which have already been in place for years, *see* NMFS_107631-33, does not fill this gap. The protocol requires speed reductions *only* when "mother-calf pairs, pods, or large assemblages (greater than three) of any marine mammal are observed near a vessel." NMFS_741. Rice's whales traveling alone or in pairs are not covered. Moreover, any effects from this protocol are already included in the effects of the action; they are not additive results of the RPA. NMFS_121-22.

is impossible for NMFS to "insure that the RPA does not jeopardize the species." *San Luis*, 747 F.3d at 636; *see Bureau of Reclamation*, 426 F.3d at 1092 (holding that BiOp must contain analysis showing species "would receive sufficient protection against jeopardy under the proposed [RPA]"); *2020 BiOp*, 2024 WL 3860211, at *29-31. The Court rejected the 2020 RPA because it "did not explain how the measures it adopted would actually mitigate the risk of jeopardy arising from the . . . stressor[] they purported to assuage." *Id.* at *32. The Court should do the same here.

## V.    The BiOp Lacks a Legally Sufficient Incidental Take Statement.

An ITS serves as a check on the BiOp's assumptions and conclusions by establishing a monitored and enforceable take limit "threshold that, when exceeded, results in an unacceptable level of take and requires parties to re-initiate Section 7 consultation" immediately. *Bernhardt 2020*, 982 F.3d at 748; *see* 50 C.F.R. § 402.14(i)(3), (4); *Sierra Club v. U.S. Dep't of the Interior* (*Sierra Club v. Interior*), 899 F.3d 260, 269-71 (4th Cir. 2018). Accordingly, all incidental takes anticipated by a BiOp must be included in an ITS. *Bernhardt 2020*, 982 F.3d at 749. An ITS also must include measures to "minimize" the impact of take and, in the case of marine mammals, to comply with the MMPA. *Id.* at 742 (quoting 50 C.F.R. § 402.14(i)(1)). The ITS here violates the ESA in two respects: (1) it omits anticipated incidental take of whales, failing to impose necessary mitigation or ensure that take does not violate the MMPA; and (2) it lacks required limits for anticipated incidental take from oil spills and marine debris.

### A.    The ITS Fails to Comply with the ESA's Requirements for Whales.

The ESA treats take of listed marine mammals differently from that of other species. When incidental take of a marine mammal is anticipated, the ESA requires NMFS to do two additional things before issuing a valid ITS: It must first authorize that incidental take pursuant to MMPA section 101(a)(5) (16 U.S.C. § 1371(a)(5)), and it must "specif[y] those measures that are necessary to comply with section 1371(a)(5)." 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1)(iii). These requirements give effect to the MMPA's "more conservative" limitation that any take have no more than a "negligible impact" on a marine mammal population. *Ctr. for*

39

*Biological Diversity v. Salazar* (*Salazar 2012*), 695 F.3d 893, 913 (9th Cir. 2012). While NMFS purported to follow the requirements for incidental take of whales from G&G surveys, it did not do so for the other stressors the BiOp expects will take sperm whales and Rice's whales.

NMFS cannot simply omit anticipated take of whales from the ITS. If incidental take "is reasonably certain to occur," to marine mammals or any other species, it must be included in an ITS. 50 C.F.R. § 402.14(g)(7); *Salazar 2012*, 695 F.3d at 910; *Ctr. for Biological Diversity v. NOAA Fisheries*, 644 F. Supp. 3d 574, 588-89 (N.D. Cal. 2022); *Ctr. For Biological Diversity v. Ross* (*Ross I*), 613 F. Supp. 3d 336, 340 (D.D.C. 2020); *cf. Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252, 270-71 (D.D.C. 2022) (explaining NMFS cannot set ITS take level at zero when anticipated take is greater than zero), *vacated as moot*, 2024 WL 324103 (D.D.C. Jan 29, 2024). The BiOp estimates the action will harm or kill more than a dozen Rice's whales and sperm whales as a result of vessel strikes, vessel noise, marine debris, oil spills, and (for sperm whales only) pile driving. NMFS_570-71, 573-74.

> Because the agency anticipated incidental take of [sperm and Rice's] whales as a result of the action covered by the BiOp, the ESA required it to issue an ITS that did four things: specified the impact of such incidental taking on the species; included reasonable and prudent measures necessary or appropriate to minimize such impact; provided measures that are necessary to keep that impact at a "negligible" level under the MMPA, and set forth the terms and conditions that must be complied with by the Federal agency to implement those measures.

*Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (cleaned up) (quoting 16 U.S.C. § 1536(b)(4)(i)-(iv))). NMFS did none of those things for this take.

NMFS recognized it may not include whale take in an ITS without first complying with the MMPA requirements. NMFS_610. Section 7(b)(4) of the ESA "lay[s] out the prerequisites the agency must satisfy before even being permitted to produce an ITS and proceed with the project." *Ross I*, 613 F. Supp. 3d at 340 (citing 16 U.S.C. § 1536(b)(4)(A)-(C)). It directs NMFS to "provide" a federal agency with an ITS only "*[i]f* after consultation," NMFS makes three findings: (A) and (B) that the action and its incidental take, respectively, will not jeopardize the species, and (C) that "if an endangered species or threatened species of a marine mammal is

40

involved, the taking is authorized pursuant to" § 101(a)(5) of the MMPA. 16 U.S.C. § 1536(b)(4) (emphasis added). "The text of the ESA is crystal clear." *Ross I*, 613 F. Supp. 3d at 346. NMFS must authorize expected take under the MMPA *before* issuing an ITS covering marine mammals. *Id.*; *accord Raimondo*, 610 F. Supp. 3d at 267-71.

The ESA and MMPA work in tandem when incidental take is anticipated. "[T]he ESA and accompanying regulations plainly require . . . that the ITS find that any take resulting from the proposed agency action will neither jeopardize the continued existence of the listed species nor run afoul of § 101(a)(5) of the MMPA." *Ross I*, 613 F. Supp. 3d at 347. "If the anticipated incidental take would impose more than a negligible impact on the species, then the proposed action would violate the MMPA." *2020 BiOp*, 2024 WL 3860211, at *32. And if the action would violate the MMPA, "then the proposed action violates § 7(b)(4)" of the ESA. *Id.* at *33; *accord Ross I*, 613 F. Supp. 3d at 347. If the action "could not be authorized under the MMPA, then [an] agency [is] obligated to revise its action to ensure any anticipated take" of marine mammals is no more than negligible. *Raimondo*, 610 F. Supp. 3d at 269 (quotation marks omitted).

Nowhere did NMFS confirm that all anticipated take of Rice's whales and sperm whales complies with the MMPA or ensure that its effects are no more than negligible. That necessarily means NMFS failed to demonstrate that the action does not violate ESA section 7(b)(4). In addition, NMFS deprived the whales of vital, legally required substantive protections by not including measures necessary to comply with the MMPA. *See* 16 U.S.C. § 1536(b)(4)(C)(iv).

The upshot is NMFS is giving the green light for a federal action that is causing unauthorized take, in violation of both the MMPA and ESA, without imposing necessary, legally required mitigation to alleviate take of the most critically endangered whale in the nation. *See* NMFS_109365 (BSEE finding no "ESA compliance" problem when Shell oil vessel caused lethal take of sperm whale, despite omission of such take from 2020 ITS). NMFS may complain it is difficult to authorize take under the MMPA before issuing a BiOp and ITS, but NMFS "cannot rewrite the statute just because they do not agree with its consequences." *Ross I*, 613 F.

41

Supp. 3d at 347; *see also Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1032 (9th Cir. 2005) ("[A]n agency cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives."). Failing to properly include the other anticipated take in an ITS is "about as straightforward a violation of the ESA as they come." *Ross I*, 613 F. Supp. 3d at 347.

### B. The ITS Unlawfully Fails to Specify the Amount and Extent of Expected Take from Oil Spills and Marine Debris.

Each ITS must include an amount and extent of *all* anticipated incidental take that, when reached, requires the agency to reinitiate consultation immediately. *Bernhardt 2020*, 982 F.3d at 749; *Sierra Club v. Interior*, 899 F.3d at 270. The BiOp estimates that marine debris and one 100,000 bbl oil spill will incidentally cause the lethal or sublethal take of several whales, hundreds of thousands sea turtles, and dozens of Gulf sturgeon. NMFS_492, 498 (tbl.88), 548-49 (tbl.100). However, NMFS unlawfully omitted that take from the ITS.

NMFS did so because it has taken the position that releases of oil and marine debris are not "lawful," so the resulting take does not fit the regulatory definition of "incidental take." NMFS_611. The regulations define incidental take as any "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity." 50 C.F.R. § 402.02. NMFS cannot dispute that the oil and gas activity covered in the BiOp is "otherwise lawful." Under the regulation, then, incidental take is any "takings that *result from*" that oil and gas activity.

The BiOp explicitly states that oil spills "may result from oil and gas development and production from federally-regulated oil and gas activities in the Gulf of America." NMFS_499, 532. And it states "the Oil and Gas Program may lead to marine debris." NMFS_490. It considers both types of discharges "Effects of the Action": They "are reasonably certain to occur and would not occur but for the Oil and Gas Program activities." *Id.*

NMFS's indefensible position, then, is that takes from oil spills and marine debris are effects of the action but do not result from the action. Because the regulations define an effect as anything "caused by" the action, 50 C.F.R. § 402.02, NMFS's position necessarily is that oil spill

and marine debris take is "caused by" the action but does not "result from" the action.

NMFS's exclusion of oil spill and marine debris take has important practical consequences. It means the ITS is not capable of monitoring that take to "serve[] as a check on the agency's original decision" that take from those and other stressors will not cause jeopardy. *Salazar 2012*, 695 F.3d at 911 (citation omitted). While the BiOp "note[s] that reinitiation of consultation would be necessary" if the volume or effects of oil spills exceeded the amount analyzed in the BiOp, NMFS_611, that "hopelessly noncommittal" assertion is no substitute for an ITS take limit that would automatically trigger a duty to reinitiate consultation once it is exceeded, *see Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 54 (D.D.C. 2024); *see also Oceana*, 2020 WL 5995125, at *14. NMFS was required to include take limits for oil spills and marine debris in the ITS. Its failure to do so violates the ESA.

## VI.    The Court Should Vacate the BiOp and ITS.

"Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall . . . set aside' unlawful agency action." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (quoting 5 U.S.C. § 706(2)). Accordingly, the Fourth Circuit has uniformly concluded that unlawful BiOps must be vacated. *E.g.*, *Appalachian Voices*, 25 F.4th at 283; *Defs.*, 931 F.3d at 366; *Sierra Club v. Interior*, 899 F.3d at 295; *Dow AgroSciences*, 707 F.3d at 475; *see 2020 BiOp*, 2024 WL 3860211, at *36. While other circuits have allowed remand without vacatur in limited circumstances under the test outlined in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993), the Fourth Circuit "has never formally embraced" that approach. *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). "However, even under *Allied-Signal*, vacatur is the only permissible remedy when the agency decision is contrary to law, the agency entirely failed to consider an important aspect of the problem, or the agency offered an explanation counter to the record." *2020 BiOp*, 2024 WL 3860211, at *37 (citations omitted).

This Court accordingly vacated the 2020 BiOp after finding it unlawful. *Id.* at *38-39. The Court should do the same here. As detailed above, the BiOp is unlawful in multiple respects,

43

NMFS failed to consider numerous important factors, and NMFS reached conclusions that run counter to the record. Vacatur would also have the important practical effect of preventing the Bureaus from continuing to rely on an unlawful BiOp to authorize new oil and gas activity without meaningful protections for species during remand. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (noting remand without vacatur "invites agency indifference" (citation omitted)); *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1039-40 (D. Mont. 2020) ("To allow the Corps to continue to authorize new oil and gas pipeline construction [during remand] could seriously injure protected species and critical habitats—the very danger that the ESA aims to prevent." (cleaned up)).

Conservation Groups recognize the Court twice deferred vacatur of the 2020 BiOp. *2020 BiOp III*, 2024 WL 3860211, at *39-40; *Sierra Club v. NMFS*, 2024 WL 6817999, at *1. NMFS and Intervenors "bear the burden to prove that vacatur is unnecessary" or should be deferred again. *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

## CONCLUSION

The 2025 BiOp includes numerous inaccurate assumptions, math errors, incorrect interpretations of the facts and science, and otherwise arbitrary analyses and conclusions. As a result, it fails to ensure against jeopardy or require necessary, legally required species protections. For the above reasons, Conservation Groups ask the Court to declare the BiOp in violation of the ESA and APA, and vacate and remand the unlawful BiOp and ITS.

Respectfully submitted this 3rd day of October.

*/s/ Christopher D. Eaton*
Christopher D. Eaton (D. MD Bar 21544)
Stephen D. Mashuda (*pro hac vice*)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
ceaton@earthjustice.org
smashuda@earthjustice.org

44

Ava Ibanez Amador (*pro hac vice*)
EARTHJUSTICE
48 Wall St., 15th Floor
New York, NY 10005
212-845-7376 Telephone
alamador@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Center for Biological Diversity, Friends of the Earth, Turtle Island Restoration Network, and Natural Resources Defense Council*

45