**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **SIERRA CLUB**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civ. No. DLB-25-1627** |
| **NATIONAL MARINE FISHERIES SERVICE**, *et al.*, | * | |
| | * | |
| **Defendants.** | | |

**MEMORANDUM OPINION**

Sierra Club, Center for Biological Diversity, Friends of the Earth, Turtle Island Restoration Network, and Natural Resources Defense Council filed this action under the Administrative Procedure Act ("APA") and the Endangered Species Act ("ESA") against the National Marine Fisheries Service ("NMFS") and Eugenio Piñeiro Soler, in his official capacity as NMFS's Assistant Administrator ("federal defendants"). The plaintiffs challenge—as arbitrary, capricious, and contrary to law—NMFS's 2025 biological opinion and accompanying incidental take statement concerning the likely impact on ESA-protected species of federally authorized oil and gas activities in the Gulf of Mexico, recently renamed the Gulf of America by the President ("Gulf").

Chevron U.S.A. Inc., the American Petroleum Institute, EnerGeo Alliance, and the National Ocean Industries Association ("intervenor defendants") successfully moved to intervene in this case, and days later, they filed a motion to transfer the case to the U.S. District Court for the Western District of Louisiana. For the following reasons, the motion to transfer is denied.

## I. Background

The outer continental shelf ("OCS") is a region of submerged land that begins about three miles from the United States's shore and extends 200 nautical miles from shore. ECF 32, ¶ 36; *see* 43 U.S.C. §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar. 14, 1983). The portion of the OCS located in the Gulf is the site of "extensive" activity related to "oil and gas exploration, development, and production," including "drilling wells, constructing pipelines, installing entire subsea production systems, pumping oil and gas, and loading and transporting oil, gas, and cargo on ships." ECF 32, ¶ 51. These activities are governed by the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, pursuant to which the Bureau of Ocean Energy Management within the U.S. Department of the Interior ("Interior") "lease[s] and allow[s] development of oil and gas deposits in the [OCS]." *Id.* ¶ 38; *see* 30 C.F.R. § 550.101. Another agency within Interior, the Bureau of Safety and Environmental Enforcement, is "responsible for enforcing safety and environmental standards for offshore oil and gas activities and approving some activities." ECF 32, ¶ 37; *see* 30 C.F.R. § 250.101.

The Gulf is home to many marine species classified as "endangered" or "threatened" under the ESA, including the Rice's whale, Kemp's ridley sea turtle, hawksbill sea turtle, smalltooth sawfish, oceanic whitetip shark, boulder star coral, and queen conch. ECF 32, ¶¶ 45–49. Because oil and gas activities in the Gulf may adversely affect these species and their habitats—through "oil spills, vessel strikes, noise . . . , marine debris and other water pollution, and underwater explosions," *id.* ¶ 51—the ESA and its implementing regulations require that Interior consult with NMFS (one of the agencies responsible for administering the ESA, *see* 50 C.F.R. § 402.01(b)) to ensure that Interior's lease sales and authorization of these activities are "not likely to jeopardize the continued existence of" these species "or result in the destruction or

adverse modification of" their habitat, *see* 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a); ECF 32, ¶¶ 26–27, 52.

Following a consultation with Interior, NMFS issues a biological opinion that must, among other things, assess the likelihood that federally sanctioned oil and gas activities will imperil the Gulf's endangered or threatened species or "adversely modify" their habitats. ECF 32, ¶ 29; *see* 50 C.F.R. § 402.14(h). If NMFS determines that oil and gas activities will imperil protected species or adversely modify their habitats, NMFS "must propose reasonable and prudent alternatives (RPAs), if available, that will mitigate the proposed action to avoid jeopardy and adverse modification of critical habitat." ECF 32, ¶ 32. If NMFS determines that oil and gas activities or proposed RPA(s) will not have these adverse effects, but will incidentally "take"— that is, "harass, harm . . . wound, [or] kill," 16 U.S.C. § 1532(19)—members of a protected species, NMFS must supplement the biological opinion with an "incidental take statement" ("ITS"). ECF 32, ¶ 34; 50 C.F.R. § 402.14(i)(1). The ITS "specifies the amount of take that may occur without causing jeopardy or adverse modification of critical habitat, as well as the measures required to limit take." ECF 32, ¶ 34; 50 C.F.R. § 402.14(i)(1). If the take threshold specified in the ITS is exceeded, Interior "must reinitiate consultation [with NMFS] immediately." 50 C.F.R. § 402.14(i)(5).

Three of NMFS's biological opinions on oil and gas activities in the Gulf are relevant to this litigation. In 2007, NMFS issued a biological opinion predicting that oil spills in the Gulf would not pose a significant threat to protected species or their habitats and that "the largest spill possible would be *at most* 15,000 [barrels]." ECF 32, ¶ 54. This prediction was disproven— catastrophically so—just a few years later by the Deepwater Horizon disaster, which caused roughly 4.9 million barrels of oil to flow into the Gulf. *Id.* ¶ 55.

Later that same year, NMFS and Interior reinitiated consultation, leading to a nearly decade-long process that culminated in the issuance of another biological opinion in 2020 ("2020 BiOp"). *Id.* ¶¶ 59–60. The 2020 BiOp predicted that oil and gas activities in the Gulf would jeopardize the Rice's whale but no other ESA-protected species and would not adversely modify critical habitats. *Id.* ¶ 61. The 2020 BiOp was challenged in court. In October 2020, the plaintiffs (excluding Natural Resources Defense Council) sued NMFS and its then-Assistant Administrator in this district, contending that the 2020 BiOp violated the APA, 5 U.S.C. § 701 *et seq.*, and the ESA, 16 U.S.C. § 1531 *et seq.* ECF 1, ¶¶ 142–70, in *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. DLB-20-3060 (D. Md. Oct. 21, 2020) ("*Sierra Club I*"). As here, the intervenor defendants intervened in that case. ECF 55 in *Sierra Club I*.[1] The intervenor defendants, NMFS, and NMFS's Assistant Administrator moved to transfer the case either to the U.S. District Court for the Southern District of Texas or to the U.S. District Court for the Eastern District of Louisiana. ECF 16, 57 & 59 in *Sierra Club I*. That motion was denied on May 24, 2021. *Sierra Club I*, 2021 WL 4704842, at *3 (D. Md. May 24, 2021).

On August 19, 2024, the Court granted summary judgment to the plaintiffs, concluding that the 2020 BiOp violated the APA and ESA because: (1) it "underestimated the risk and harms of oil spills to protected species," (2) it assumed, contrary to the evidence, that the populations of the Rice's whale and Gulf sturgeon "remained as large as they were before the . . . Deepwater Horizon oil spill"; (3) its "RPA addressed only a couple of the stressors that were likely to

---

[1] When EnerGeo Alliance intervened in *Sierra Club I*, it was known as the International Association of Geophysical Contractors. It has since changed its name. *See* Press Release, EnerGeo Alliance, EnerGeo Alliance Unites Energy and Geoscience Industries to Advance Energy Access Worldwide (Jan. 18, 2022), available at https://energeoalliance.org/wp-content/uploads/2022/01/EnerGeo_Rebrand20Press20Release-No20Embargo_FINAL_2022010-2.pdf.

jeopardize the Rice's whale, without explaining why addressing only those two problems was good enough or . . . how the measures it proposed would prevent the jeopardy those two stressors would cause"; and (4) its "ITS failed to recognize oil spill take as incidental take and adopted an irrational surrogate for determining how many listed species would be taken by vessel strikes." *Sierra Club I*, 797 F. Supp. 3d 440, 456 (D. Md. 2024). The Court ordered the 2020 BiOp vacated effective December 20, 2024, *id.* at 497, but subsequently modified the vacatur date to May 21, 2025, *Sierra Club I*, 2024 WL 6817999, at *1 (D. Md. Oct. 21, 2024).

On May 20, 2025, NMFS issued yet another biological opinion ("2025 BiOp"), which is the subject of this suit. ECF 32, ¶ 70. On the same day that the 2025 BiOp was issued, the plaintiffs filed this action. ECF 1. They filed an amended complaint on August 1, 2025. ECF 32. In broad strokes, the plaintiffs contend that the 2025 BiOp violates the APA and ESA because (1) its ITS does not account for various likely sources of incidental take resulting from oil and gas activities in the Gulf, (2) it irrationally discounts the likelihood of another oil spill exceeding 1 million barrels, (3) it underestimates the full degree of foreseeable harm from oil spills, (4) it underestimates the dangers that vessel strikes pose to the Rice's whale, sea turtles, and the Gulf sturgeon, (5) it discounts other dangers that oil and gas activities will pose to the Rice's whale and its critical habitat, (6) it underestimates the likely harms caused by geological and geophysical surveys in the Gulf, (7) it does not rationally analyze how oil and gas activities may jeopardize the ability of any species to recover from oil and gas activities to the point where the species is no longer endangered or threatened, (8) it neglects to account for the effects of climate change in its jeopardy or critical habitat analysis, (9) it concludes, without evidence or explanation, that vessel noise, marine debris, oil spills, and sound from seismic surveys will not jeopardize the Rice's whale, and (10) its RPA is insufficient. *Id.* ¶¶ 70–142. The plaintiffs ask this Court to, among other

things, declare the 2025 BiOp and accompanying ITS unlawful, vacate them, and order NMFS to "prepare a sufficiently protective biological opinion within six months." *Id.* ¶¶ 1–4 (prayer for relief).

A few hours after the plaintiffs filed this action, the state of Louisiana and two of the intervenor defendants (Chevron U.S.A. Inc. and the American Petroleum Institute) (collectively, "*Louisiana* plaintiffs") filed suit against NMFS and the Secretary of the U.S. Department of Commerce in the U.S. District Court for the Western District of Louisiana. ECF 1 in *Louisiana v. Nat'l Marine Fisheries Serv.*, No. 2:25-cv-00691-JDC-TPL (W.D. La. May 20, 2025) ("*Louisiana*"). The *Louisiana* plaintiffs contend that the 2025 BiOp is arbitrary, capricious, and contrary to law because it (1) overestimates the risk posed to ESA-protected species by oil and gas vessels and, in turn, imposes an unreasonable RPA to address these overstated risks and (2) incorrectly estimates take and imposes unreasonable measures to reduce take. *Id.* ¶¶ 82–104. They seek, among other things, declaratory relief and an order remanding the 2025 BiOp to NMFS, without vacating it, so that NMFS may "correct and revise" the 2025 BiOp. *Id.* ¶¶ 1–2 (prayer for relief).

On July 24, 2025, Chevron U.S.A. Inc., the American Petroleum Institute, EnerGeo Alliance, and the National Ocean Industries Association filed a motion to intervene in this case. That unopposed motion was granted on August 20, 2025. On August 28, the intervenor defendants filed a motion to transfer this case to the U.S. District Court for the Western District of Louisiana. ECF 44. The plaintiffs opposed the motion to transfer, ECF 58, and the intervenor defendants filed a reply, ECF 62. The federal defendants do not oppose the motion. ECF 57. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

## II.    Standard of Review

The intervenor defendants move to transfer this case pursuant to 28 U.S.C. § 1404(a).
Section 1404(a) provides, in relevant part, that "[f]or the convenience of parties and witnesses, in
the interest of justice, a district court may transfer any civil action to any other district or division
where it might have been brought[.]" A party requesting a change of venue under this statute "bears
the burden of showing, by a preponderance of the evidence, that transfer to another venue is
proper." *Menk v. MITRE Corp.*, 713 F. Supp. 3d 113, 132 (D. Md. 2024) (quoting *Kimber v. Plus3
IT Sys., LLC*, No. ELH-18-3046, 2019 WL 1518970, at *3 (D. Md. Apr. 5, 2019)). To meet its
burden, the movant must rely on more than "[m]ere assertions of inconvenience or hardship" that
it will suffer in the plaintiff's chosen forum. *Versus Evil LLC v. PNC Bank, Nat'l Ass'n*, 613 F.
Supp. 3d 916, 923 (D. Md. 2020) (quoting *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d
757, 770 (D. Md. 2009)). The movant may and should "submit affidavits from witnesses and
parties involved that explain the inconvenience and hardship[.]" *Id.* (quoting *CoStar*, 604 F. Supp.
2d at 770).

In analyzing a motion to transfer under § 1404(a), the court first must satisfy itself that
"the action could have been brought in the transferee district." *D2L Ltd. v. Blackboard, Inc.*, 671
F. Supp. 2d 768, 777 (D. Md. 2009). If so, then the court considers four factors: "(1) the weight
accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of
the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund
v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). Section 1404(a) "provides no guidance
as to the weight" the court should give each of these factors. *D2L*, 671 F. Supp. 2d at 777–78
(quoting *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 632 (E.D. Va. 2006)).
"[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should

rarely be disturbed." *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1946)). Ultimately, "[t]he decision whether to transfer venue is committed to the sound discretion of the trial court." *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008).

## III.  Analysis

The Court first considers whether this action could have been brought in the Western District of Louisiana. It could have. The Court then considers whether the § 1404(a) factors favor transfer. They do not.

### A.  Proposed Transferee District

"To establish that an action could have been brought in the proposed transferee district, the movant must show that the district is a proper venue and that the transferee court would have personal jurisdiction over the defendant." *Menk*, 713 F. Supp. 3d at 134 (quoting *D2L*, 671 F. Supp. 2d at 778).

The parties do not dispute that the U.S. District Court for the Western District of Louisiana would have personal jurisdiction over the intervenor defendants and the federal defendants. Their dispute is whether venue would be appropriate there. The intervenor defendants argue that venue would be proper in that district, or in any district in the Gulf region, because the oil and gas activities to which the 2025 BiOp applies have a substantial impact on the Gulf and the plaintiffs assert harms to their members' enjoyment of public lands and waters in the Gulf. The plaintiffs respond that the intervenor defendants have not met their burden to show that venue would be proper in the Western District of Louisiana because the 2025 BiOp was not produced in that district and the mere fact that the 2025 BiOp impacts the Gulf region does not make venue proper there. The Court agrees with the intervenor defendants.

In civil actions where a defendant "is an officer or employee of the United States," venue is proper

> in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1). Only subsection (B) could be a basis for finding venue in the Western District of Louisiana. "[I]n determining whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action," but also "should review 'the entire sequence of events underlying the claim.'" *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001)). Section 1391 allows "for venue to be proper in more than one judicial district." *Id.*

In *Sierra Club I*, the Court resolved a similar motion to transfer venue to the Southern District of Texas or the Eastern District of Louisiana. Although the motion was denied, the Court found that venue would be proper in either district. *Sierra Club I*, 2021 WL 4704842, at *4. Because the "[p]laintiffs' APA claims . . . depend[ed] in part on demonstrating that the 2020 [BiOp] ignored the devastation . . . that [the] Deepwater Horizon [oil spill] had caused" and because that spill "stretched into the coastal waters in [the Southern District of Texas and the Eastern District of Louisiana] and throughout the Gulf Coast," the Court found that a substantial part of the "sequence of events underlying the claim" had occurred in the proposed transferee districts. *Id.* (italics omitted) (quoting *Mitrano*, 377 F.3d at 405).

The plaintiffs contend that their claims here are sufficiently different from the claims in *Sierra Club I* such that venue would no longer be proper in a state bordering the Gulf. They point out that, unlike in *Sierra Club I*, they do not claim here "that the 2025 BiOp ignored the effects of

the [Deepwater Horizon] spill." ECF 58, at 13. That much is true, but the claims they do make show that venue would be appropriate in the Western District of Louisiana.

Early in their amended complaint, the plaintiffs assert that "[e]ach year, oil and gas operators conduct hundreds of thousands of activities that adversely affect threatened and endangered species and their habitats in the Gulf[.]" ECF 32, ¶ 51. In support of this claim, the plaintiffs provide a map of drilling platforms, leases, and pipelines in the Gulf; the map shows a high concentration of oil and gas infrastructure along the Louisiana coast. *Id.* Fig. 1. In fact, this map shows several drilling platforms and pipelines near the coastline south of Lake Charles, Louisiana, the seat of the division of the U.S. District Court for the Western District of Louisiana where the *Louisiana* plaintiffs filed their challenge to the 2025 BiOp. *Id.* These oil and gas activities and their effects are foundational to the plaintiffs' claims, and they are the reason that Interior consulted NMFS and that NMFS produced the 2025 BiOp. *See id.* ¶ 52 (asserting that "[d]ue to the[ ] effects" of oil and gas activity, "federal lease sales and authorizations pursuant to OCSLA are subject to the ESA's . . . consultation requirements").

Moreover, throughout their complaint, the plaintiffs identify events in the Gulf that have jeopardized ESA-protected species. For example, they argue that Rice's whales have been exposed to marine debris from oil and gas activity in the "western and central Gulf," a region that includes the waters off the coast of Louisiana. *Id.* ¶ 112. Elsewhere, they argue that, even setting Deepwater Horizon aside, there have been several oil spills exceeding 10,000 barrels in the Gulf that NMFS ignored in assessing the risk of future spills. *Id.* ¶ 93. And they further contend that "[o]il and gas activity in the western and central Gulf" imperils species such as Rice's whales and sea turtles and that NMFS disregarded this fact. *Id.* ¶¶ 124–26.

Thus, although the plaintiffs' claims have evolved somewhat since *Sierra Club I*, the "entire sequence of events underlying" their claims is substantially connected to the Western District of Louisiana, and venue would be proper there. *See Mitrano*, 377 F.3d at 405 (quoting *Uffner*, 244 F.3d at 42). This case could have been brought in the Western District of Louisiana.

**B.    Section 1404(a) Factors**

The Court's conclusion that this case could have been brought in the Western District of Louisiana does not end the transfer analysis. The intervenor defendants also must establish by a preponderance of the evidence that the § 1404(a) factors—"(1) the weight accorded to [the] plaintiff[s'] choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice," *Plumbing Servs.*, 791 F.3d at 444—counsel in favor of transfer. They have not met their burden.

**1.    Plaintiffs' Choice of Venue**

"[P]laintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations)[.]" *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. Tex.*, 571 U.S. 49, 63 (2013). "[T]he [c]ourt ordinarily accords substantial weight to the plaintiff's choice of forum," but this deference "is lessened when the forum is not the plaintiff's home forum and when the complained-of conduct did not occur in that forum." *Bell v. CSX Transp., Inc.*, 758 F. Supp. 3d 390, 394 (D. Md. 2024).

The plaintiffs chose to file suit in the District of Maryland even though Maryland is not their home forum. The intervenor defendants argue that the plaintiffs' choice of venue is entitled to little weight because "virtually every aspect of this case . . . relates to and occurs by the Gulf," because the "[p]laintiffs' alleged injuries, and the natural resources they seek to protect, occur outside of the District of Maryland," and because the decision-making underlying the 2025 BiOp

has been "spread across three regions: NMFS headquarters in Maryland, various agency offices in D.C., and the Gulf." ECF 44-1, at 18–19. They essentially argue that "the complained-of conduct did not occur" here. *See Bell*, 758 F. Supp. 3d at 394.

The Court confronted a similar question in *Sierra Club I*. There, the same plaintiffs—save one—challenged the 2020 BiOp, and the defendants moved to transfer the case to a Gulf district. In support of their motion, the defendants argued that the plaintiffs' choice of venue was entitled to "minimal deference because [the] [p]laintiffs [were] not residents of this [d]istrict and all of the central issues of the case relate[d] to the Gulf." *Sierra Club I*, 2021 WL 4704842, at *4. Although the Court agreed that the plaintiffs did not reside in Maryland, it nonetheless concluded that "a portion of the 'conduct complained of' took place" in this district because NMFS's "consultation lead" for the 2020 BiOp worked at NMFS's offices in Silver Spring; the administrative record for the 2020 BiOp was located in Maryland; and "nothing otherwise suggests that decisions pertinent to the [2020 BiOp] were made in either transferee district." *Id.*

The circumstances here are indistinguishable. As in *Sierra Club I*, the consultation lead for the 2025 BiOp worked out of NMFS's Silver Spring headquarters. *See* ECF 66-5, at 2 (October 25, 2022 email identifying Allison Hernandez as consultation lead); ECF 66-4, at 3 (May 19, 2022 letter listing Allison Hernandez's address as 1315 East-West Highway, Silver Spring, Maryland 20910). As in *Sierra Club I*, the administrative record is in Silver Spring. *See* ECF 59-3, at 28–29 (stating that "[a] complete record of th[e] consultation [that produced the 2025 BiOp] is on file electronically with the NMFS [Office of Protected Resources] in Silver Spring, Maryland"); ECF 71-2, at 1 (declaration of Samuel D. Rauch III, NMFS's Deputy Assistant Administrator for Regulatory Programs, stating that his office is in Silver Spring and that he "supervise[s] staff who have custody and control of the NMFS documents that were used to compile" the administrative

record). And as in *Sierra Club I*, the intervenor defendants have not shown that any decisions relevant to the 2025 BiOp were made in the transferee district (here the Western District of Louisiana).[2] For the same reasons a portion of the complained-of conduct occurred in the District of Maryland in *Sierra Club I*, a portion of the complained-of conduct in this case occurred in this district. The Court thus affords the plaintiffs' choice of venue substantial weight.

This factor weighs against transfer.

### 2.    Convenience of Witnesses and Parties

The intervenor defendants argue that the next two § 1404(a) factors—witness convenience and access and the parties' convenience—"are, at best, marginally relevant in this case" because this is a record-bound APA case in which there will be no witnesses. ECF 44-1, at 22. The intervenor defendants are correct that, generally, "the location of witnesses is not a significant factor" when considering a motion to transfer a challenge to an agency action. *Chakrabarti v. U.S. Citizenship & Immigr. Servs.*, No. PJM-21-1945, 2021 WL 4458899, at *4 (D. Md. 2021) (quoting *Melnattur v. U.S. Citizenship & Immigr. Servs.*, No. 20-cv-3013, 2021 WL 3722732, at *7 (D.D.C. Aug. 23, 2021)); *see also W. Watersheds Project v. Tidwell*, 306 F. Supp. 3d 350, 360 (D.D.C. 2017) (Jackson, D.J.) ("[G]iven the primary importance of the administrative record in cases such as this one, factors such as the convenience of the witnesses or the ease of access to sources of proof typically do not sway the transfer inquiry in either direction."). Nevertheless, as the Court previously explained when confronted with a similar argument, *see*

---

[2] The intervenor defendants contend that the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement both conducted "[s]ubstantial work" on the 2025 BiOp out of their Louisiana offices. ECF 44-1, at 20. But those offices are located in New Orleans—which is in the Eastern, not the Western, District of Louisiana. *See Contact Us*, Bureau of Ocean Energy Mgmt., https://www.boem.gov/about-boem/contact-us (last visited Dec. 22, 2025); *Gulf of America Region*, Bureau of Safety & Env't Enf't, https://www.bsee.gov/who-we-are/our-organization/regional-offices/gulf-of-america (last visited Dec. 22, 2025).

*Sierra Club I*, 2021 WL 4704842, at *4, while these factors may carry less weight in the context of an APA challenge, the intervenor defendants still bear the burden of showing that they or witnesses would be inconvenienced by litigating in this district—for example, that they would struggle to access evidence or would have to travel far from home to attend court, *see Menk*, 713 F. Supp. 3d at 136. They have made no such showing here.[3]

Whatever weight these factors may have in this case, they do not weigh in favor of transfer.

### 3. Interest of Justice

Finally, the intervenor defendants argue that the interest of justice favors transferring this case. "[T]he interest of justice is a factor (albeit an amorphous and somewhat subjective one) to be considered on its own and . . . it is very important." 15 Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3854 (4th ed. Sept. 2025 update) ("Wright & Miller"). This factor "encompasses all relevant considerations apart from witness and party convenience." *Smellie v. Marriott Int'l, Inc.*, No. PX-23-2121, 2023 WL 7487183, at *4 (D. Md. Nov. 13, 2023). These considerations include "the local interest in having localized controversies decided at home," *Atl. City Assocs. No. Two (S-1), LLC v. Reale*, No. CCB-11-78, 2011 WL 1769842, at *3 (D. Md. May

---

[3] In their reply, the intervenor defendants argue for the first time that the risk of inconsistent judgments between this case and *Louisiana* would inconvenience them because it "would create significant regulatory and legal uncertainty[.]" ECF 62, at 16. Because the intervenor defendants first made this argument in their reply, the Court need not consider it. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) (explaining that "[g]enerally, 'new arguments cannot be raised in a reply brief' before the district court" because permitting a movant to do so "runs the risk of depriving a nonmovant an opportunity to respond") (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013)). But even if the Court did consider this argument, it would fail. "[T]he party convenience factor includes assessment of the ease of access to sources of proof, the cost of obtaining the attendance of witnesses, and the availability of compulsory process." *Menk*, 713 F. Supp. 3d at 136 (quoting *Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 717 (E.D. Va. 2005)). It does not entail an inquiry into whether a party is likely to suffer "regulatory and legal uncertainty" absent transfer.

9, 2011), the interest in avoiding "duplicative litigation" that may yield conflicting outcomes, *Kukich v. Electrolux Home Prods., Inc.*, No. ELH-16-3412, 2017 WL 345856, at *10 (D. Md. Jan. 24, 2017) (quoting *Mamani*, 547 F. Supp. 2d at 474), and the relative familiarity of the transferor and transferee courts with the facts and claims at issue, *see Intell. Ventures I LLC v. Cap. One Fin. Corp.*, No. PWG-14-111, 2014 WL 979198, at *5–6 (D. Md. Mar. 12, 2014).

The intervenor defendants argue that the interest of justice favors transferring this case because transfer will conserve judicial resources by allowing this challenge to the 2025 BiOp and the challenge filed by the *Louisiana* plaintiffs to be heard by the same court, because transfer will mitigate the risk of inconsistent results between the two cases, and because Louisiana is more connected to this case than Maryland. The Court is not persuaded.

### a.  First-to-File Rule

The intervenor defendants argue that transfer would be in the interest of justice because it would avoid "the 'wastefulness of time, energy and money' that occurs when 'two cases involving precisely the same issues are simultaneously pending in different [d]istrict [c]ourts.'" ECF 44-1, at 14 (quoting *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960)). In a similar vein, they argue that transfer would mitigate the risk of this case and *Louisiana* yielding inconsistent results. *Id.* at 15. By making these arguments, the intervenor defendants appear to be asking the Court to apply the so-called "first-to-file" rule.

The first-to-file rule provides that "[o]rdinarily, when multiple suits are filed in different [f]ederal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed." *Allied-Gen. Nuclear Servs. v. Commonwealth Edison Co.*, 675 F.2d 610, 611 n.1 (4th Cir. 1982). In other words, "the rule affords 'priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts,

15

to the party who first establishes jurisdiction.'" *Capitol Payment Sys., Inc. v. Di Donato*, No. ELH-16-882, 2017 WL 2242678, at *12 (D. Md. May 23, 2017) (quoting *LWRC Int'l, LLC v. MindLab Media, LLC*, 838 F. Supp. 2d 330, 337 (D. Md. 2011)). "The rule is to be applied in an equitable, case-by-case manner." *Savada v. RRH Energy Servs., LLC*, No. RDB-25-1156, 2025 WL 3018773, at *3 (D. Md. Oct. 29, 2025). It can apply even when the first-filed action was filed "just hours" before the second. *See, e.g.*, *Neuralstem, Inc. v. StemCells, Inc.*, 573 F. Supp. 2d 888, 900 (D. Md. 2008).

Courts evaluating the interest of justice factor often invoke the first-to-file rule as a basis for transferring a second-filed action to the district where the first-filed action was filed. *See, e.g.*, *Cluck-U, Corp. v. Cluck-U Chicken, Inc.*, No. PWG-15-3439, 2016 WL 9526438, at *4–5 (D. Md. May 27, 2016); *Siemens Energy, Inc. v. CSX Transp., Inc.*, No. RDB-15-1072, 2016 WL 1059261, at *6 (D. Md. Mar. 17, 2016). But the rule cuts both ways. The first-to-file rule also can be a basis for *retaining* jurisdiction over a first-filed case when a party seeks to transfer the case to the district where the second-filed case was brought. *See, e.g.*, *Corcoran v. Peleus Ins. Co.*, No. TDC-20-1115, 2021 WL 3472664, at *6 (D. Md. Aug. 6, 2021); *W.R. Grace & Co.-Conn. v. Wood Env't & Infrastructure Sols., Inc.*, No. GLR-22-285, 2023 WL 9900961, at *3–5 (D. Md. Apr. 17, 2023).

To determine whether the first-to-file rule applies, the Court considers three factors: "(1) the chronology of the filings, (2) the similarity of the parties involved, and (3) the similarity of the issues or claims at stake." *Smiley v. Arizona Beverages, LLC*, No. MJM-23-1107, 2024 WL 327044, at *2 (D. Md. Jan. 29, 2024) (quoting *Intellor Grp., Inc. v. Cicero*, No. TDC-19-10, 2019 WL 1643549, at *3 (D. Md. Apr. 16, 2019)). "To apply the [first-to-file] rule, 'the actions being assessed need not be identical if there is substantial overlap with respect to the issues and parties.'" *Kendus v. USPack Servs. LLC*, No. SAG-19-496, 2020 WL 1158570, at *2 (D. Md. Mar. 10, 2020)

(quoting *Hopeman Brothers, Inc. v. Continental Cas. Co.*, No. 4:16cv187, 2017 WL 1381665, at *7 (E.D. Va. Apr. 17, 2017)).

Here, there is no dispute that this case was filed before *Louisiana*. The intervenor defendants contend that this case and *Louisiana* involve "precisely the same issues" and thus could yield "inconsistent judgments." ECF 44-1, at 14–15. If they are correct, and if there also is a "substantial overlap" between the parties in both cases, *Kendus*, 2020 WL 1158570, at *2 (quoting *Hopeman Brothers*, 2017 WL 1381665, at *7), then the first-to-file rule would apply and counsel against transfer.

The parties in this case and in *Louisiana* are substantially similar. Two of the three *Louisiana* plaintiffs are intervenor defendants in this action. One of the two federal defendants here, NMFS, is also a defendant in *Louisiana*. While Soler is not named as a defendant in *Louisiana*, the other *Louisiana* defendant is the Secretary of the U.S. Department of Commerce, who is Soler's superior and, like Soler, is sued in his official capacity. *See Curtis v. Pracht*, 202 F. Supp. 2d 406, 418 n.7 (D. Md. 2002) (explaining that a suit against a government official in their official capacity is "considered [a] suit[ ] against the United States itself") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Thus, the only real party in interest in *Louisiana* who is not also a party to this action is the state of Louisiana. While the parties in this case and *Louisiana* are not identical—the plaintiffs here and two of the intervenor defendants are not participating in that case—the parties in *Louisiana* are, with one exception, a subset of the parties here. Thus, the similarity of the parties between the two cases cuts in favor of applying the first-to-file rule.

The similarity of the issues also supports application of the first-to-file rule. Both this case and *Louisiana* involve an APA challenge to the 2025 BiOp, and both require review of the same administrative record. *See, e.g.*, *Smiley*, 2024 WL 327044, at *3 (claims in first- and second-filed

action were substantially similar where they brought claims under state laws that "substantially overlap[ped]"); *Choice Hotels Int'l, Inc. v. Jai Sai Baba LLC*, No. GLS-23-146, 2023 WL 5509211, at *6 (D. Md. Aug. 25, 2023) (application of first-to-file rule warranted where both cases related to the same agreements "and the factual content therein").

There also is—as the intervenor defendants point out—a risk that this case and *Louisiana* will yield inconsistent judgments, which further indicates that this case and *Louisiana* present similar issues. *See, e.g.*, *Intellor Grp.*, 2019 WL 1643549, at *4 (finding issues in the two cases similar and a resulting risk of conflicting rulings). For example, in their pending motion for summary judgment, the *Louisiana* plaintiffs contend that the 2025 BiOp overestimates the jeopardy that vessel strikes pose to Rice's whales and that if NMFS had followed the "best available scientific and commercial data" in preparing the 2025 BiOp, it would have concluded that "vessel strikes of Rice's whales are *not* 'reasonably certain to occur.'" ECF 33-1, at 32–33, in *Louisiana*. Thus, they argue, the 2025 BiOp's RPA—which they characterize as "intended to avoid jeopardy caused by phantom vessel strikes of Rice's whales"—"is neither reasonable nor prudent," and NMFS lacked "statutory authority to propose" it. *Id.* at 34. By contrast, the plaintiffs here contend that "NMFS significantly *underestimated* the magnitude of likely vessel strikes" on Rice's whales and sea turtles. ECF 63-1, at 29 (emphasis added). They further argue that the RPA is *insufficient* to mitigate the risks posed by vessel strikes and "[f]ails to [a]ccount for the [f]ull [s]cope of [h]arm" from oil and gas activities. *Id.* at 43–47. If the *Louisiana* plaintiffs and the plaintiffs here succeed on their respective arguments in two different courts, the rulings would conflict.

Consider another example of potentially inconsistent judgments. In their motion for summary judgment, the *Louisiana* plaintiffs argue that the 2025 BiOp uses an overinclusive

definition of "take by harassment," encompassing phenomena that "do not even have the 'potential to injure a marine mammal.'" ECF 33-1, at 36–37, in *Louisiana*. As an example of this alleged overreach, the *Louisiana* plaintiffs point to the 2025 BiOp's discussion of the impacts of underwater seismic surveys on sperm whales and Rice's whales and the 2025 BiOp's corresponding "impos[ition] [of] sound restrictions on seismic surveys." *Id.* at 37. Meanwhile, the plaintiffs here argue that noise from seismic surveys poses a "pervasive . . . threat" to Rice's whales and that the 2025 BiOp "fails to fully account for the harm" that the noise will cause. ECF 63-1, at 33. If both arguments are successful in different courts, it will be hard to reconcile the conflicting rulings. This is precisely the sort of scenario that triggers the first-to-file rule. *See, e.g.*, *Fisher v. Rite Aid Corp.*, No. RDB-09-1909, 2010 WL 2332101, at *2 (D. Md. June 8, 2010) (observing that one of the purposes of the first-to-file rule is "to prevent the possibility of reaching conflicting results") (citing *Rite Way Crack Repair, LLC v. Guardian Crack Repair, LLC*, No. WMN-09-1207, 2009 WL 2923085, at *4 (D. Md. Sept. 10, 2009)).[4]

By arguing that this case and *Louisiana* present similar issues and that there is a risk of inconsistent judgments unless this case is transferred, the intervenor defendants invited the Court to consider whether the first-to-file rule applies. After consideration of the relevant factors—the chronology of the filings, the similarity of the parties, and the similarity of the issues—the Court

---

[4] This is not to say, of course, that the issues in this case and in *Louisiana* overlap in every respect. They do not. For example, the plaintiffs here contend that the 2025 BiOp "arbitrarily disregarded or underestimated" the possibility of various oil spills, ECF 63-1, at 17, whereas the *Louisiana* plaintiffs make no claims about the 2025 BiOp's analysis regarding future oil spills. The plaintiffs here also contend that the 2025 BiOp's jeopardy analysis fails to fully account for the impact of climate change, *see id.* at 39, whereas the extent or propriety of NMFS's consideration of climate change is not at issue in *Louisiana*. Indeed, the scope of the plaintiffs' challenge to the 2025 BiOp here appears to be broader than the *Louisiana* plaintiffs' challenge to the 2025 BiOp.

finds they weigh in favor of applying the first-to-file rule and denying transfer of this first-filed action to another district.

Perhaps aware that they have boxed themselves into a corner, the intervenor defendants also argue that application of the first-to-file rule is inappropriate here because the plaintiffs "raced to the courthouse" to file this suit before the intervenor defendants filed *Louisiana* and because *Louisiana* has progressed further than this case. ECF 44-1, at 21. These arguments are unpersuasive.

It is true that "an exception to the first-to-file rule" can be warranted when the first plaintiff engages in "bad faith, anticipatory suit, [or] forum shopping." *See Neuralstem*, 573 F. Supp. 2d at 901 (D. Md. 2008) (quoting *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 622 (9th Cir. 1991)). In particular, "[a]n improper anticipatory filing" that may warrant an exception to the rule "is one made under the apparent threat of a presumed adversary filing the mirror image of that suit in another court." *First Nationwide Mortg. Corp. v. FISI Madison, LLC*, 219 F. Supp. 2d 669, 673 (D. Md. 2002) (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 557 (S.D.N.Y. 2000)). The mere fact, however, that two lawsuits were filed hours apart does not, on its own, establish that the first filing was improperly anticipatory. *See, e.g.*, *Neuralstem*, 573 F. Supp. 2d at 900–01 (concluding that lawsuit filed "just hours" before second suit bore no "trappings of bad faith, anticipatory action, or forum shopping"). Courts ordinarily require evidence that the second filer "at least . . . [was] the first to threaten litigation," *Intellor Grp.*, 2019 WL 1643549, at *4, such as communications between the parties' counsel. *See, e.g.*, *First Nationwide Mortg. Corp.*, 219 F. Supp. 2d at 673 (declining to apply first-to-file rule where evidence showed that plaintiff filed suit only after receiving threat of legal action from defendant);

*Citi Trends, Inc. v. Coach Inc.*, No. RDB-17-1763, 2018 WL 723792, at *6 (D. Md. Feb. 6, 2018) (same).

The intervenor defendants point to no evidence suggesting the plaintiffs acted in bad faith or filed this suit in anticipation of their suit in *Louisiana*. For instance, the intervenor defendants do not claim that, before this suit was filed, they threatened the plaintiffs that they would file *Louisiana* once the 2025 BiOp was issued. Indeed, it is not surprising that the plaintiffs filed suit in this district on the day of the 2025 BiOp's issuance, given that this Court previously heard a challenge to the 2020 BiOp by largely the same plaintiffs and that the 2025 BiOp was intended to be responsive to this Court's ruling in *Sierra Club I*. It would have been surprising had the plaintiffs *not* filed suit in the court that has the most familiarity with the issues. The intervenor defendants have not shown that this suit was improperly anticipatory.

But even if the Court were to agree with the intervenor defendants that the plaintiffs "raced to the courthouse" in a manner that might justify an exception to the first-to-file rule, the intervenor defendants admit they did the same thing. *See* ECF 44-1, at 20 ("Nor is [the] [p]laintiffs' forum choice entitled to meaningful weight *simply because [they] won the race to the courthouse by a few hours*.") (emphasis added). Just as the first-to-file rule is equitable, so too are its exceptions. *See Kendus*, 2020 WL 1158570, at *4; *see also Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016) (characterizing bad faith, anticipatory suit, and forum shopping as "equitable considerations"). And the Court will not grant the intervenor defendants the benefit of an equitable exception to the first-to-file rule when, by all appearances, they engaged in the very conduct they now decry. *See Wudi Indus. (Shanghai) Co. v. Wong*, 143 F.4th 250, 263 (4th Cir. 2025) ("The unclean hands doctrine can serve as a bar to equitable relief in favor of a party that has engaged in inequitable and related conduct.").

As for the intervenor defendants' contention that application of the first-to-file rule is unwarranted because *Louisiana* has progressed further than this case, that argument is stale. In the briefing on their motion to transfer, which was completed on October 3, 2025, the intervenor defendants argued that in *Louisiana* the parties had "negotiated an expedited schedule" and that *Louisiana* "has consequently progressed much faster than this case, with the administrative record having been filed months ago and summary judgment briefing well underway." ECF 62, at 17–18. Whatever purchase that argument may previously have had has since diminished. The plaintiffs here have now filed their motion for summary judgment, ECF 63, and briefing on that motion and any cross-motions for summary judgment will, per the most recent briefing schedule, be complete in the spring, ECF 68, at 2. Summary judgment briefing is thus underway in this case. Moreover, the administrative record has been lodged with this Court. ECF 71. The intervenor defendants' motion to "complete or supplement" the administrative record, ECF 59, will be ripe at the end of January 2026, and the Court intends to rule on it expeditiously. The progress of this case is not far behind *Louisiana*.[5]

In sum, the intervenor defendants are correct that this case and *Louisiana* present similar issues and there is a risk of conflicting rulings if the cases are resolved by different courts, but those are not reasons to transfer this case to the Western District of Louisiana. On the contrary, the

---

[5] The chief case cited by the intervenor defendants in support of their claim that the first-to-file rule should not apply when the first-filed case has made less progress than the second-filed case is inapposite. In that case, the difference in progress between the two cases was far more significant than it is here. *See Quesenberry v. Volvo Grp. N. Am., Inc.*, Civ. Action No. 1:09cv00022, 2009 WL 648658, at *4 (W.D. Va. Mar. 10, 2009) (declining to apply first-to-file rule where, although "complaints and motions to dismiss ha[d] been filed in both cases" as of plaintiffs' brief in opposition, defendant also had filed an answer in second action and the plaintiffs had filed and argued a motion for a preliminary injunction in the second action), *R&R adopted by* 2009 WL 1451690 (W.D. Va. May 21, 2009). And in any event, "how far the second-filed case has progressed relative to the first-filed case is only a minor consideration." *Moore's Elec. & Mech. Constr., Inc. v. SIS, LLC*, No. 6:15-cv-00021, 2015 WL 6159473, at *6 (W.D. Va. Oct. 20, 2015).

similarities and potential conflicting rulings militate in favor of retaining jurisdiction over this first-filed case. And while the Court does not intend to minimize the difficulties that inconsistent judgments may pose, the intervenor defendants have not persuaded the Court that an exception to the first-to-file rule is warranted.

### b.   Louisiana's Connection to This Case

The intervenor defendants also contend that transfer is in the interest of justice because Louisiana has a greater connection to this dispute than Maryland. In particular, they contend that the oil and gas activities evaluated by the 2025 BiOp were authorized in Louisiana, that the 2025 BiOp applies to oil and gas activities occurring in the Gulf, that the 2025 BiOp concerns ESA-protected species that reside in the Gulf, that vacatur of the 2025 BiOp would have "substantial economic consequences for the State of Louisiana and its residents," and that the plaintiffs' injuries occurred in the Gulf. ECF 44-1, at 16–17. As the intervenor defendants see it, this suit concerns a local controversy that should be decided locally—in Louisiana.

At first blush, the intervenor defendants' argument has some appeal. It is true that courts often conclude that "the administration of justice is better served when the action is litigated in the forum that encompasses the locus of operative facts," particularly "in environmental cases or other matters involving land or matters of local policy." 15 Wright & Miller § 3854. As the Court observed in *Sierra Club I*, however, this dispute cannot be fairly characterized as merely local. In enacting the ESA, Congress determined that the protection of endangered species is an important *national* interest, *see* 16 U.S.C. § 1531(a)(3), and likewise determined, in enacting the OCSLA, that the OCS "is a vital *national* resource reserve held by the Federal Government for the *public*," 43 U.S.C. § 1332(3) (emphasis added); *see also Sierra Club I*, 2021 WL 4704842, at *5 (citing these U.S. Code provisions for the proposition that "[t]hese interests—drilling for globally

consumed resources while also preserving wildlife at risk of extinction throughout the Gulf OCS—cannot fairly be claimed by any given local community"). Though the impacts of this case will be felt in Louisiana, they also "will be felt nationally" because the resources and interests at stake belong to the nation, not just to the people of Louisiana. *See Sierra Club I*, 2021 WL 4704842, at *5 (quoting *Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2, 11 (D.D.C. 2013)).

Moreover, unlike the *Louisiana* Court, this Court oversaw the challenge to the 2020 BiOp, and this Court's decision in *Sierra Club I* informed the very agency action now under review. While it is certainly important to consider the locus of operative facts, it is also appropriate to "consider[ ] the relative expertise of a particular district court in a particular substantive legal field." 15 Wright & Miller § 3854. Through years of litigation, this Court has developed an intimate familiarity with NMFS's decision-making process, the statutory and regulatory framework that governs it, and the history of the 2025 BiOp's development.[6]

The handful of cases cited by the intervenor defendants do not move the needle, and some bolster the Court's conclusion. They point to *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 113 (D.D.C. 2015), which involved a challenge to a U.S. Fish and Wildlife Service regulation authorizing "certain oil and gas industry players" in Alaska to "take" a particular species of walrus off the Alaskan coast. In transferring that case to the District of Alaska, which had "significant

---

[6] In their motion, the intervenor defendants contend that "the Louisiana court is already familiar with a central issue in both cases—Program vessels potentially striking Rice's whales." ECF 44-1, at 14. In support of this claim, they point to the fact that, in 2023, they and Louisiana filed a lawsuit (*Louisiana v. Haaland*, No. 2:23-cv-1157-JDC-TPL (W.D. La.)) challenging the inclusion of certain measures in a lease sale designed to protect the Rice's whale—protective measures to which the plaintiffs and defendants had stipulated during the pendency of *Sierra Club I*. *See Sierra Club I*, 711 F. Supp. 3d 522, 531–32 (D. Md. 2024). The judge who presided over *Haaland* is presiding over *Louisiana*. The *Louisiana* Court's limited exposure to a discrete issue related to the 2020 BiOp does not compare to this Court's familiarity with the entire 2020 BiOp, the 2020 BiOp's legal defects, and the fixes to those defects that should be in the 2025 BiOp.

(and recent) experience" with similar issues, *id.* at 117, the court concluded that although the regulation at issue certainly had implications for nationally-important issues like global warming and the plight of a federally-protected species, it was most directly connected to Alaska because it applied "only to oil and gas explorers operating in and around Alaska," concerned "only activities in the Chukchi Sea around (and within) Alaska's sovereign territory," and concerned a species found only in Alaska. *Id.* at 116–17 (emphasis omitted). The court also took pains to point out that because the challenged regulation did "not authorize, or 'permit' the actual activities associated with oil and gas exploration," the case did not involve "the national issue of how, where, or when America gets its oil and gas." *Id.* at 117 (quoting 78 Fed. Reg. at 35,365). Here, by contrast, NMFS's 2025 BiOp substantially impacts the activities associated with oil and gas exploration, whether by proposing restrictions on those activities or by giving them the green light. *See, e.g.*, *Sierra Club I*, 797 F. Supp. 3d at 452 (observing that the 2020 BiOp "impose[d] several restrictions on vessel activity" but otherwise concluded that oil and gas activities would not jeopardize ESA-protected species or their habitats). Moreover, the Gulf region "is home to much of the nation's oil and gas industry[.]" *Id.* at 450. Unlike *Alaska Wilderness League*, then, this case clearly involves "the national issue of how, where, or when America gets its oil and gas." 99 F. Supp. 3d at 117. Finally, this Court, like the transferee court in that case, has "significant (and recent) experience" with the issues underlying this litigation. *Id.*

The intervenor defendants also cite *Wildearth Guardians v. U.S. Bureau of Land Management*, 922 F. Supp. 2d 51 (D.D.C. 2013), in which the court transferred a challenge to certain coal lease sale authorizations in Wyoming's Powder River Basin to the District of Wyoming. The court transferred the case in part because the lease sales would impact the local economy. *Id.* at 55. However, unlike this case, there is no indication that the *Wildearth Guardians*

Court had experience with similar litigation, let alone litigation that influenced the development of the challenged agency action.

The intervenor defendants' reliance on *Natural Resources Defense Council, Inc. v. Coit*, No. LKG-21-1827 (D. Md. Apr. 21, 2022) also is misplaced. There, the court transferred a challenge to NMFS's rule authorizing "the use of seismic surveys to locate fossil fuel beneath the ocean floor" to the Eastern District of Louisiana. ECF 96, at 2, in *Nat Res. Def. Council*. The court did so in part because the plaintiffs "allege[d] injuries involving a species of whale that is present off the coast of Louisiana" and "allege[d] injuries caused by geological and geophysical surveys conducted off the Gulf of Mexico." *Id.* at 5. But once again, there is no indication that the *Natural Resources Defense Council* Court had extensive experience handling similar issues.[7]

Finally, the intervenor defendants cite *Western Watersheds Project* for the general proposition that "courts . . . have routinely found it appropriate to transfer cases involving land and local wildlife to the local forum." ECF 62, at 13. The Court agrees, as a general matter. But if the intervenor defendants contend that *Western Watersheds Project* closely resembles this case, the Court disagrees. There, the court transferred a case involving a challenge to the U.S. Forest

---

[7] In *Natural Resources Defense Council*, the successful motion to transfer was filed by the American Petroleum Institute and EnerGeo Alliance (at the time known as the International Association of Geophysical Contractors), both of which are intervenor defendants in this case. In that case, American Petroleum Institute and EnerGeo Alliance argued that Louisiana was "the most obvious and convenient forum for th[e] lawsuit" because the challenged agency rule "ar[ose] out of a settlement agreement from litigation filed in the Eastern District of Louisiana" and the judge overseeing that case had "presided over [it] for *11 years*." ECF 84-1, at 7–8, in *Nat. Res. Def. Council*. They also argued that the first-to-file rule supported their transfer request because they had filed a lawsuit challenging the same rule in the Eastern District of Louisiana two months earlier. *Id.* at 18–21. Indeed, the first-to-file rule was another basis on which the *Natural Resources Defense Council* Court concluded that transfer was appropriate. ECF 96, at 4–5, in *Nat. Res. Def. Council*. By the intervenor defendants' logic in *Natural Resources Defense Council*, their transfer request in this case should be denied because this Court, not the *Louisiana* Court, presided over the litigation that informed the 2025 BiOp, and because this case, not *Louisiana*, was filed first.

Service's issuance of an elk-feeding permit on a single feeding site in Wyoming, concluding that the case was "in its essence, a local dispute" that should be resolved by the U.S. District Court for the District of Wyoming. *W. Watersheds Project*, 306 F. Supp. 3d at 360. The challenge concerned a "one-off federal-agency permit" for a single site in Wyoming, not "a broad policy or program with far-reaching effects[.]" *Id.* at 361–63. Moreover, the District of Wyoming had considerable experience deciding "environmental challenges involving wildlife species within the state of Wyoming[.]" *Id.* at 364. Here, by contrast, the challenged agency action applies to all oil and gas activities throughout the Gulf, and it will have far-reaching effects on the national oil and gas industry. And here, unlike in *Western Watersheds Project*, this Court, not the proposed transferee court, has extensive prior experience with the issues underlying this litigation.

The challenge to the 2025 BiOp is not, as the intervenor defendants insist, a local Louisiana dispute that is best decided by a Louisiana court. The 2025 BiOp concerns matters of national importance that this Court is equipped to consider.

The interest of justice factor weighs against transfer.

## IV. Conclusion

Though this case could have been brought in the Western District of Louisiana, the intervenor defendants have not met their burden to show that the balance of the § 1404(a) factors tips in their favor, let alone strongly enough to justify disturbing the plaintiffs' choice of forum. The intervenor defendants' motion to transfer is denied. A separate Order follows.


Date: December 22, 2025

_____
Deborah L. Boardman
United States District Judge